UNITED STATES, Appellee

v

CARL R. PITASI, Lieutenant (jg), U. S. Navy, Appellant

20 USCMA 601, 44 CMR 31

No. 23,650

June 22, 1971

*Wayne B. Giampietro, Esquire*, argued the cause for Appellant, Accused. With him on the brief were *Elmer Gertz, Esquire, Miss Ralla Klepak, Captain Paul A. Reichs*, USMCR, and *Lieutenant Charles W. Corddry, III*, JAGC, USNR.

*Captain John J. Reilly*, USMCR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Charles J. Keever*, USMC, and *Lieutenant Wayne E. Babler, Jr.*, JAGC, USNR.

### Opinion of the Court

FERGUSON, Senior Judge:

Contrary to his pleas, the accused was convicted of two specifications each of sodomy, lewd acts with another, and fraternization with enlisted men, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 USC §§ 925 and 934, respectively. He was sentenced to be dismissed from the service. The Court of Military Review set aside and dismissed one of the specifications alleging fraternization but affirmed the sentence to dismissal. We granted review to consider the following issues:

1. Whether the military judge erred to the prejudice of the accused by admitting the testimony of Sea-

man Merriman relative to an alleged "fresh complaint" by Seaman Schultz.

2. Whether specification 3 of Charge II states an offense punishable by court-martial.

## I

The "victim" of the sodomy and lewd acts specifications was a Seaman Schultz. He was also one of the enlisted men with whom the accused allegedly fraternized.[1] At trial, Schultz testified in detail relative to his association with the accused and their activities surrounding the alleged offenses. Following the initial encounter with the accused, Schultz testified, he was disturbed and in a quandary as to what to do. He returned to the barracks and told Seaman Merriman that an officer had made a pass at him that evening. They, purportedly, discussed what could be done and decided it best to drop the whole business and not report anything. Defense counsel objected to this testimony on the ground that it was hearsay but trial counsel asserted that it was admissible as evidence of fresh complaint. The law officer admitted the testimony on the basis asserted by trial counsel. Subsequently Merriman testified that on a Friday evening in October 1968, Schultz had awakened him and related that "an officer [had] made a pass at him." They discussed the matter and decided to "go back to bed and sleep over it for awhile." Not until months later was a complaint made to higher authorities.

The accused testified under oath and denied in detail all of the charges of abnormal sexual activities with Schultz.

Paragraph 142c, Manual for Courts-Martial, United States, 1969,[2] provides in part:

"In a prosecution for a sexual offense in which an alleged victim of either sex has testified that consent was lacking, evidence that the alleged victim made a complaint of the offense within a reasonable time after its commission is admissible for the purpose of *corroborating the testimony of the victim* . . . ." [Emphasis supplied.]

However, where the "complaint" seems to constitute no more than ordinary barracks' gossip at best, or, at the other end of the scale, malicious bragging over implicating a respected officer with a disgusting and degrading offense, it is inadmissible in evidence. United States v Bennington, 12 USCMA 565, 31 CMR 151 (1961).

In the case at bar, the witness Schultz, who testified under a grant of immunity from the convening authority,[3] was the Government's greatest liability. As the pretrial investigating officer stated in his report:

"Schultz is the model of an impeachable witness. His consistent expression of a desire to get out of the navy at any cost presents a strong motive for falsifying testimony."

Trial counsel agreed for in his closing argument he admitted:

"Now, as to Schultz, well, there's not much we can say about Schultz. The law officer will instruct you as follows: He will say, in part, that Schultz is a particularly sleazy, scurrilous character, that he is fully capable of doing and saying anything to accomplish his purpose, no matter how nefarious that purpose may be. He will continue on to say that Schultz is fully capable of lying and perjurying [sic] himself before this

---

[1] The Court of Military Review set aside and dismissed this specification (specification 4, Charge II) on the ground that it merged with the sodomy specifications and was not separately punishable. United States v Lovejoy, 20 USCMA 18, 42 CMR 210 (1970).

[2] The trial began July 22, 1969. The Revised Edition of the Manual became effective August 1, 1969, however, no revision was made in this particular paragraph.

[3] The post-trial review was conducted by the Commandant of the Sixth Naval District since the convening authority, the Commandant of the Ninth Naval District, was disqualified by virtue of the grant of immunity.

court. I've got to buy that. He's that kind of a character."

With reference to the credibility of the witness Schultz, the law officer instructed the court:

"I refer now to the witness Schultz. He is a person, even by his own testimony, a particularly scurrilous character. Even by his own admission, he is fully capable of doing or saying anything to accomplish his purpose, however nefarious that purpose may be. He readily admitted that he would do anything to get out of the service, as you recall. Therefore, that Schultz had a motive for lying is clear. Schultz is a person fully capable of lying and perjuring [sic] himself on the witness stand. So much for Schultz as a character.

"But, in addition, Schultz is to be considered by this court as an accomplice, with the possible exception of the offense alleged in the first specification of the second charge. A witness, by definition, is an accomplice if, by his own testimony, he was culpably involved in the offense. And, irrespective of other considerations, the credibility of an accomplice, even though apparently credible, is of doubtful integrity and is to be received with great caution. On the other hand, a witness's testimony need not be rejected simply because he is an accomplice."

The first specification of the second charge, referred to by the law officer, is that which Schultz allegedly "complained" of to Seaman Merriman.

We need not detail at length the circumstances revealed at trial, including Schultz's testimony, which substantiate the Government's own assessment of Schultz as an unreliable witness. Suffice to note, the concession by the Government is well documented. With reference to the particular charged offenses, Schultz testified that he first met the accused when the latter was Officer-of-the-Day at the service school, Great Lakes, Illinois. Schultz, who had admittedly been drinking, went to

Command Headquarters where he told a warrant officer that he was quitting the Navy and renouncing his citizenship. He attempted to burn his white hat and, being unsuccessful, burned his ID card, liberty card, and chow pass. The accused, who was called to the office, ordered Schultz confined in the brig overnight. Schultz testified that he did these things in order to obtain a discharge from the Navy. The following day, Thursday, Schultz was interviewed at length by the accused relative to his problems in the Navy. The accused was sympathetic but not quite understanding. On Friday, Schultz called the accused and requested permission to again speak with him. They conversed, had lunch together at accused's invitation, and continued their conversation after lunch. That evening they met for a few drinks in the accused's BOQ quarters, went to the Officers' Club and returned to Pitasi's room. According to Schultz the accused suggested he spend the night there. Allegedly, the first lewd assault, the one reported to Merriman, occurred that night in the accused's quarters. This activity took place on or about October 25, 1968. Schultz testified further that they continued their mutual association and the accused again sexually assaulted him on or about October 27th, while both were riding in a fast-moving automobile. The two sodomy offenses allegedly occurred when Schultz visited the accused's quarters on or about January 18, 1969. Schultz had previously, on January 13, 1969, reported the October incidents to an agent of the Office of Naval Intelligence. This was the *first report* he made other than to Merriman. Despite an admonition not to become further involved with the accused, Schultz did so in order to enhance his chances of getting out of the Navy. Schultz originally declined to testify at the Article 32 investigation on the ground that his testimony might tend to incriminate him. He testified at the Article 32 and at trial only after being granted immunity from prosecution concerning any matters in which he was implicated in this case and concerning which he testified. Schultz expected to be administratively dis-

charged "through association as a homosexual" subsequent to this trial. As he testified at trial, "it's the only alternative they have."

Under the circumstances of this case, we do not believe that the testimony of Seaman Merriman ■ comes within the rule of fresh complaint. Cf. paragraph 142c, Manual, supra. Schultz was so unconcerned over the event that he did not bother to identify the officer involved, or even to indicate the nature of the alleged action stating no more than that this unnamed person had "made a pass at him." Thereafter, they both went to sleep and no effort was made to report the incident to higher authorities for two and one-half months, despite the fact that another lewd assault allegedly was made on Schultz by the accused two days later. The testimony of Merriman simply cannot be considered as a "complaint," and its admission in evidence was prejudicially erroneous. United States v Bennington, supra.

Paragraph 153a, Manual, supra, reflects the following rule of evidence:

"The court may ordinarily draw its own conclusions as to the credibility of a witness and attach such weight to his evidence as his credibility may warrant. However, *there are cases in which the court would not be warranted in accepting certain testimony as being sufficient to constitute a basis for a determination of guilt.* For example, . . . a conviction cannot be based upon uncorroborated testimony given by an alleged victim in a trial for a sexual offense or upon uncorroborated testimony given by an accomplice in a trial for any offense, if in either case the testimony is self-contradictory, uncertain, or improbable. Even if apparently corroborated and apparently credible, testimony of an accomplice which is adverse to the accused is of questionable integrity and is to be considered with great caution." [Emphasis supplied.]

As noted above, the law officer instructed that "Schultz is to be considered by this court as an accomplice, with the possible exception of the offense alleged in the first specification of the second charge," the one reported to Merriman. The "questionable integrity" of the testimony of the ordinary accomplice (United States v Scoles, 14 USCMA 14, 33 CMR 226 (1963); United States v Stoltz, 14 USCMA 461, 34 CMR 241 (1964)) is further heightened in this case by the concession of trial counsel that "Schultz is fully capable of lying and perjurying [sic] himself before this court." Given the further fact that Schultz testified under a grant of immunity,[4] in which case the Government carries the burden of establishing some credibility in him (United States v Scoles, supra, at page 22, concurring opinion of Judge Kilday), the triers of fact might conclude that they would not be warranted in accepting his testimony as a basis for a determination of guilt. Paragraph 153a, Manual; United States v Bennington; and United States v Stoltz, all supra. Despite his lack of credibility, we are not prepared to hold that Schultz ■ is so unsavory a witness as to require that his testimony be disregarded *as a matter of law.* While reversal is required, a rehearing, if practicable, may be held.

## II

The accused was also charged with but found not guilty by the court-martial of one specification alleging sodomy with one Seaman Clark, on or about September 28, 1968. He remains convicted, under Article 134, Code, supra, only of one specification alleging that he fraternized and associated with Clark from September 26 to October 9, 1968, "in violation of the *custom* of the Naval Service of the United States that officers shall not fraternize and associate with enlisted men on terms of military equality." (Emphasis supplied.)

---

[4] By the grant of immunity, Schultz accomplished his purpose of establishing a basis for his discharge from the Navy without being held criminally accountable for his part in the charged offenses, if in fact they took place.

**605**

Appellate defense counsel contend that the alleged fraternization charge should be dismissed because it merged with the greater and related charge of sodomy, and for the further reason that apart from such alleged sodomy (on which an acquittal has been entered) the charge of fraternization is not an offense cognizable by a court-martial. Appellate Government counsel argue that despite the finding of not guilty of sodomy with Clark, the accused was properly convicted, in light of the evidence, under the general article of the Code, inasmuch as *fraternization* by an officer with an enlisted man has, *by custom*, always been held to be prejudicial to good order and discipline in the armed forces.

The precise question has never been decided by this Court. In United States v Lovejoy, 20 USCMA 18, 21, 42 CMR 210 (1970), this Court held that a conviction of fraternization, *under the circumstances of that case*, merged with an accompanying conviction for sodomy and "for that reason was not separately punishable." In *Lovejoy*, as here, appellate counsel had contested both the constitutionality of the offense and the legal sufficiency of the allegations of the specification. Because of our holding with regard to punishment, we dismissed the charge of fraternization "without considering other aspects of the accused's attack on the validity of the findings of guilty." Judge Darden, in a separate concurring opinion, expressed reservations about the propriety of treating fraternization as a crime.

Winthrop, in his Military Law and Precedents, 2d ed, 1920 Reprint, page 41, notes:

"While the Military Law has derived from the Common Law certain of the principles and doctrines illustrated in its code, it has also a *lex non scripta* or unwritten common law of its own. This consists of certain established principles and usages peculiar or pertaining to the military status and service, and which, though unenacted, are recognized in the 84th article of war, under the designation of 'the custom of war,' as a means for the guiding of courts-martial in the administration of justice in doubtful cases. The same are also recognized by the courts and legal authorities as operative and conclusive as to questions in regard to which the written military law is silent."

In writing about the Article of War 61, Revised Statutes, § 1342 (conduct unbecoming an officer and a gentleman),[5] Winthrop discloses that, historically, officers have been prosecuted under this Article for activities described as "unbecomingly familiar association or dealing with . . . [solders or military inferiors]." Winthrop, supra, footnote 44, page 716.

Paragraph 213*b*, Manual, supra, provides:

"A *breach of a custom of the service* may result in a violation of this clause [disorders and neglects to the prejudice of good order and discipline in the armed forces] of Article 134. In its legal sense the word 'custom' imports something more than a method of procedure or a mode of conduct or behavior which is merely of frequent or usual occurrence. *Custom arises out of long established practices which by common consent have attained the force of law in the military or other community affected by them.* There can be no such thing as a custom that is contrary to existing law or regulation. A custom which has not been adopted by existing statute or regulation ceases to exist when its observance has been long abandoned. *Many customs of the service are now set forth in regulations of the various armed forces. Violations of these customs should be charged under Article 92 as violations of the regulations in which they appear.*" [Emphasis partially supplied.]

The matter was quite extensively analyzed in United States v Free, 14 CMR 466 (NBR 1953), and a careful reading of that opinion is recommended. In

---

[5] Cf. Article 133, Uniform Code of Military Justice, 10 USC § 933.

affirming Free's conviction for fraternization, a case strikingly similar to that under consideration here,[6] the board of review stated:

"The problem presented to us is to draw a line as to where acts of fraternization or association with enlisted men by officers cease to be the innocent acts of comradeship and normal social intercourse between members of a democratic military force and become a violation of Article 134 of the Code, prejudicial to good order and discipline in the armed forces of the United States.

· · · · ·

"The military services demand a regard for authority by juniors towards their seniors which experience has shown is enhanced by the observance of decorum, tradition, custom, usage, and conventions which are peculiar to the services alone. The regard and respect for authority upon which rests the unquestioned obedience of the serviceman which is mandatory in time of battle or stress is lessened by the failure to observe niceties of military courtesy and other traditions and customs.

"Because of the many situations which might arise, it would be a practical impossibility to lay down a measuring rod of particularities to determine in advance what acts are prejudicial to good order and discipline and what are not. As we have said, the surrounding circumstances have more to do with making the act prejudicial than the act itself in many cases. Suffice it to say, then, that each case must be determined on its own merits. Where it is shown that the acts and circumstances are such as to lead a reasonably prudent person, experienced in the problems of military leadership, to conclude

that the good order and discipline of the armed forces has been prejudiced by the compromising of an enlisted person's respect for the integrity and gentlemanly obligations of an officer, there has been an offense under Article 134.

· · · · ·

"There is no risk attached when an officer offers to do simple courtesies to strangers, enlisted or civilian, such as providing transportation in an automobile, eating and drinking together under dignified conditions, and even sharing sleeping accommodations if it is shown that the persons concerned are closely related, or that their civilian social relationship is such as to make the act socially acceptable. It is not at all difficult for the reasonably prudent officer to discriminate between what circumstances justify a particular act and what render the act so curtailing of the dignity required by an officer's obligations as to make it an offense against good order and discipline. True, discrimination must be exercised, but the nature of an officer's commission demonstrates that he has been selected from among the populace as a whole to hold a position of trust and honor and has been trained to exercise the nice discrimination required. It is likewise true that a degree of judgment is required of an officer which is not required of the enlisted member of the service or of a civilian. It follows that a different standard of conduct is required in law of an officer than is required of others. This, in effect, puts him in a different legal status than the enlisted man or the civilian. While it may be difficult for the lay mind or even the lawyer whose only experience has been with civilian codes to conceive of such a burden be-

---

[6] Free was convicted *only* of fraternization with an enlisted man. Two other specifications (not further identified) were dismissed on motion by the defense at the completion of the introduction of evidence by the prosecution. Free was sentenced to lose one hundred unrestricted numbers. The case was before the board of review only because it was referred there by the Judge Advocate General of the Navy in accordance with Article 69, Uniform Code of Military Justice, 10 USC § 869.

ing imposed on one member of the community and not all, nevertheless, the nature of the military service is such that there are many acts which are offenses under military law which do not and could not apply to the civilian community. For instance, there are the military offenses of desertion and sleeping on watch which have no counterpart in the civilian's code of laws.

"We refuse to subscribe to the proposition that the Code of Military Justice operates to lower the standards of honor and conduct in the military service to that of a civilian criminal code.

"In conclusion, the accused has here been fully apprised of the acts which are regarded as an offense, evidence has been properly introduced before a duly constituted court of law, and a court composed of the peers of the accused has determined, in its judgment, that the acts of the accused constitute an offense against the good order and discipline of the armed forces of the United States. We see no reason to disturb the findings or the sentence of the court." [*Ibid.*, at pages 468, 469, 470, 471, 472.]

We are impressed by the reasoning and logic of the *Free* opinion. The fact that few charges of this nature have been referred to this Court indicates that either the "custom" is seldom violated, the penalties invoked are relatively minor (cf. Article 67(b), Code, supra, 10 USC § 867), or, as suggested by Judge Darden in *Lovejoy*, undue familiarity between an officer and a subordinate is generally being corrected by internal administrative action. These factors, however, do not, in our opinion, relieve military authorities from the obligation of providing *some guidelines* by which an officer, or those who are called upon to sit in judgment as members of a court-martial, may test what conduct is or is not violative of the "custom," in light of the fact that our armed forces are currently constituted of a large number of citizen soldiers. As the Manual states, many customs of

**608**

the service are now set forth in regulations of the various armed forces and violations of the regulation are chargeable under Article 92, Code, supra, 10 USC § 892. In such situations, the proscribed conduct is known precisely as is the maximum imposable punishment. This is not the case for an *undefined* violation of "custom" which, under Article 134, "shall be punished at the discretion of that court."

We in no way intend to depart from our holding in United States v Sadinsky, 14 USCMA 563, 34 CMR 343 (1964), wherein we iterated our prior decision that Article 134 is not void for vagueness (see United States v Frantz, 2 USCMA 161, 7 CMR 37 (1953); Dynes v Hoover, 20 Howard 65 (U.S. 1858)), that some acts are by their very nature palpably and directly prejudicial to the good order and discipline of the service. But, as recognized in *Free*, not every social contact between an officer and an enlisted man is or even can reasonably be prohibited. To do so would be inconsistent with our democratic concept of social relations and, probably, unavailing. While the drafting of an appropriate regulation might be difficult, we recommend it to the responsible military authorities.

Our review of the record in this case convinces us that the charged offense of fraternization with Seaman Clark was properly brought. The specification set forth the offense charged, sufficiently apprised the accused of what he must be prepared to meet, and the record accurately reflects the extent to which he might claim jeopardy in any future case. United States v Sadinsky, supra. The accused's testimony alone, in our opinion, was sufficient to justify the court's finding that his association with Clark was of such a nature as to be prejudicial to good order and discipline within the armed forces. United States v Free, supra.

That portion of the decision of the Court of Military Review, affirming the accused's conviction of sodomy and lewd acts with Seaman Schultz (specifications 2 and 3, Charge I, and specifica-

tions 1 and 2, Charge II) is reversed. Accused's conviction of specification 3, Charge II, is affirmed. The record of trial is returned to the Judge Advocate General of the Navy. The Court of Military Review may reassess the sentence on the basis of the remaining finding of guilty or a rehearing may be ordered.

Chief Judge QUINN and Judge DARDEN concur.