UNITED STATES, Appellee,

v.

Private First Class Ronald L. ROY, SSN
266–92–6347, United States
Army, Appellant.

CM436152.

U. S. Army Court of Military Review.

13 Feb. 1978.

Colonel Robert B. Clarke, JAGC, Major
Benjamin A. Sims, JAGC, Captain Buren R.
Shields, III, JAGC, and Captain James Re-
casner, JAGC, were on the pleadings for
appellant.

Lieutenant Colonel R. R. Boller, JAGC,
Captain Lee D. Schinasi, JAGC, and Cap-
tain Stephen D. Smith, JAGC, were on the
pleadings for appellee.

## OPINION OF THE COURT

Before JONES, MITCHELL and De-
FORD, Appellate Military Judges.

JONES, Senior Judge:

The appellant was convicted of rape [1] and
sentenced to reduction in grade and con-
finement at hard labor for two years.

The primary contention is the suffi-
ciency of the evidence. The act of inter-
course was not disputed; the issue is one of
consent. Weighing all of the evidence and
giving special consideration to the findings
of the members who saw and heard the
witnesses, we conclude that the evidence
establishes appellant's guilt beyond a rea-
sonable doubt. Although the victim initial-
ly gave appellant reason to believe his ad-
vances would be successful, she eventually
refused to give her consent and the act was
accomplished through force.

One other assigned error merits con-
sideration and that concerns the admissibili-
ty of the second pretrial statement made by
appellant. Appellant asserts the statement
was taken by the criminal investigator
without affording his assigned counsel an
opportunity to be present. The investiga-
tor, who also took the first statement from
appellant nine days earlier, advised appel-
lant fully of his rights. He did not, how-
ever, ask appellant if he in fact had counsel
and appellant did not volunteer that he had

1. A violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920.

been assigned and consulted with counsel two days previously. Appellant waived his rights and made a statement.

At the time the investigator questioned appellant the second time, the investigator did not know appellant had counsel but he knew that an Article 32 investigation was scheduled for the next day. He also knew that an accused usually had counsel at that investigation.

The United States Court of Military Appeals in *United States v. McOmber*, 24 U.S. C.M.A. 207, 51 C.M.R. 452, 1 M.J. 380 (1976), and *United States v. Lowry*, 25 U.S.C.M.A. 85, 54 C.M.R. 51, 1 M.J. 1165 (1976), held that:

> "once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code. . . ."
> *United States v. McOmber*, 24 U.S.C.M.A. at 209, 51 C.M.R. at 454, 1 M.J. at 383.

In both *McOmber* and *Lowry*, the investigator had actual knowledge of the accused's representation by counsel. Here the investigator had no such information. Absent a showing of bad faith or an attempt to circumvent the holding of *McOmber* and *Lowry*, we decline to extend those cases to an investigator who probably should but does not in fact know that an accused has counsel.[2]

We have considered the other errors but they do not require discussion or corrective action.

The findings of guilty and the sentence are affirmed.

Judge DeFORD concurs.

MITCHELL, Judge, dissenting:

I respectfully dissent.

As correctly stated by the majority the primary issue before us is the sufficiency of the evidence. Before we can resolve that issue we must consider whether the trial court's view of the facts and the law is correct. The military jury, of course, heard the testimony, as we did not. Notwithstanding, we must keep in mind the principle that:

> ". . . a conviction cannot be based upon the uncorroborated testimony of an alleged victim in a trial for a sexual offense . . . if such testimony is self-contradictory, uncertain, or improbable."[1]

I would find that the trial judge erred when he determined that the alleged victim's telephone call to Sergeant Charter, approximately four hours after the alleged attack, constituted evidence of "fresh complaint." To me her conversation is totally lacking in specificity. The sergeant testified that:

> "She called, I was on Staff Duty and she called me, she sounded upset and asked me if there was any way I could come out to her house. She advised me that she had to go to the dispensary, and she told me that PFC Roy was out that (sic) and she asked me if there was any way I could possibly come out, or have somebody come out, and get Roy out of the house. I told her I was on Staff Duty and I told her I didn't know if I would be able to get out there. I asked her what the problem was, and again she sounded upset, and she said that she definitely had to get to the dispensary and she wanted to get Roy out of the house as soon as possible. I made some comment to her, I asked her what was going on, 'Is something going on out there?' And she said that it already had. I wasn't quite sure what she meant by that at the time, but I told her I would do the best I could to try to get out there, or get someone out there."

through counsel. We find no substance to that assertion.

---

2. In conjunction with this error, the appellant also asserts that the government agents did not follow their own regulation, AR 195–2, in questioning appellant without coordinating with the staff judge advocate and making arrangements

1. Paragraph 153a, Manual for Courts-Martial, United States, 1969 (Revised edition).

It is evident that her phone call did not complain of a sexual attack, fresh or stale. At a minimum, in order for an extrajudicial declaration to constitute a complaint, it must contain, per force, the alleged statement which delineates the nature of the offense i. e., that the alleged victim did complain to the witness of a sexual offense.[2]

The Court of Military Appeals held in *United States v. Pitasi*, 20 U.S.C.M.A. 601, 605, 44 C.M.R. 31, 35 (1971), that the failure of the alleged victim of a sexual offense to "indicate the nature of the alleged action stated no more [to the witness] than this unnamed person had 'made a pass at him' ", was, indeed not a complaint. Thus it was prejudicially erroneous for the military judge to have permitted the witness to testify that his roommate, following the initial alleged sexual offense, had told him that an officer had made a pass at him that particular evening. Comparatively, I see the purported "complaint" in the case at bar as even less precise than the one in *Pitasi*. There the offense of sodomy is at least suggested. Here, the alleged victim's assertion, as testified to by Sergeant Charter, falls impermissibly short of information which might have formed a reasonable basis for a determination that a fresh complaint of rape had been made. The bland assertion that "something had been going on" could easily cover an untold variety of happenings—good or bad. The range is as wide as the human imagination. Additionally, a fresh complaint must include a showing that the victim of an alleged sex offense communicated the complaint to the witness while in a state of shock, outrage, agony and resentment—the adrenergic circumstances which prompted the report.[3] *United States v. Goodman*, 13 U.S.C.M.A. 663, 33 C.M.R. 195 (1963); *United States v. Bennington*, 12 U.S.C.M.A. 565, 31 C.M.R. 151 (1961). Without such circumstances the admission of the fact of complaint "is utterly devoid of factors upon which the admissibility of that evidence might be predicated."[4] In the instant case there is in my view a total absence of circumstances to justify the admission of the testimony regarding the quoted telephone conversation.

Absent the "fresh complaint" the prosecution's case must rest solely upon the uncorroborated testimony of the complaining witness. In my view it falls woefully short of being sufficient. To me it is so improbable that it becomes incredible. I view her behavior to be at most an open invitation—at least a temporary abulia. Selected facts in point:

The alleged victim habitually sent notes to the accused inviting him to come to her apartment to "cry on her shoulder."

She, a married woman with two infant daughters, wrote a poem and sent it to the accused telling him "if he ever needed a friend in the darkest hour then I'll be there."

After hearing that accused was in love with her and wanted to break up her marriage she engaged in a private 45-minute closed-door bedroom meeting with him where she sought clarification of his disturbing announcement. Her husband was in an adjoining room.

When she learned that her husband would be on guard duty on the night in question she sent the accused a note asking him to come to her apartment and bring some milk for the children, a book for her to read and "some sort of company."

At 0130 hours in response to her note the accused appeared at her door. He had neither the milk nor the book. She waited while he dismissed his host-driver and then after letting him enter joined on the sofa. She was dressed only in a short night gown and an outer robe.

---

2. *See United States v. Thompson*, 3 M.J. 168 (C.M.A. 1977).

3. *See generally* 4 Wigmore, Evidence, §§ 1134–39 (Chadbourne rev. 1972); 75 C.J.S. *Rape* (§§ 53–55 (1952); 65 Am.Jur.2d *Rape* §§ 76–81

(1972); 3 Underhill, Criminal Evidence §§ 757–59 (5th Ed. 1957).

4. *United States v. Bennington*, 12 U.S.C.M.A. 565, 31 C.M.R. 151 (1961).

After he began his advances she did not ask him to leave the apartment because "that would have been rude."

During the alleged attack she did not cry out because she did not want to disturb the sleeping children. She merely admonished him "to behave and be a good boy."[5]

She allowed the accused to sleep undisturbed until late the following morning because "he was a friend of the family."

She did not call the MPs because she did not know their telephone number nor call the civilian police because "she did not think of it."

She "did not know how" to report an incident involving rape.

She did not tell her husband for more than 20 hours because it would have made him "very angry."

She told her embarrassed husband only after he had been kidded by fellow soldiers about her gossipy episode with the accused and he wanted to know the particulars.

She had a reputation at Fort Knox, Ky. (the prior duty station) of "fooling around on her husband".

She suspects that her husband does not believe her version of the events.

Neither do I.

I would reverse and order the charge dismissed.

---

5. In a question and answer statement given to the CID (the subject of Judge Jones' main discussion in the principal opinion) the accused stated that _after_ the intercourse the alleged victim was crying and cramped over because she was in pain due to a pre-existing vaginal infection which had become irritated during the sex act. She then took Darvon to ease the pain. When asked the two-pronged question: "Based upon that statement, do you still think she was completely willing and that she went along with everything, knowing that she would experience pain?" He answered: "I don't know, but I don't think she was pleased with what happened because her infection had been irritated by the sexual intercourse." He also admitted that she _may_ have resisted _after_ penetration was accomplished. (underscoring supplied).