**UNITED STATES**

v.

**First Lieutenant Joanne PARRILLO, 163–60–3979 FR, United States Air Force.**

**ACM 28143.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 13 Sept. 1989.

Decided 7 Nov. 1990.

---

Appellate Counsel for the Appellant: Captain Michael D. Burt (argued); Colonel Richard F. O'Hair and Lieutenant Colonel Jeffrey R. Owens (on brief).

Appellate Counsel for the United States: Captain Morris D. Davis (argued); Colonel Joe R. Lamport; Colonel Robert E. Giovagnoni; Major Brenda J. Hollis and Major Paul H. Blackwell, Jr. (on brief).

Before LEONARD, MURDOCK and RIVES, Appellate Military Judges.

## DECISION

RIVES, Judge:

The appellant, First Lieutenant Joanne Parrillo, was convicted of a variety of charges relating to her sexual affairs with enlisted men and use of drugs.[1] On appeal, she urges that her sexual activities are not a proper basis for criminal charges. She also avers that the military judge erred in not suppressing evidence relating to one of the drug offenses. We disagree with both assertions.

### I

Parrillo is a 1985 graduate of the United States Air Force Academy. After receiving training as an air traffic control officer, she began duties as the Deputy Chief of Air Traffic Control Operations (DCATCO) in November 1986 at Royal Air Force Lakenheath, United Kingdom. She and her supervisor, the Chief of Air Traffic Control Operations (CATCO), were the only two officers assigned to Air Traffic Control Operations (ATCO). The organization included some 50 enlisted members.

The CATCO has supervisory responsibility over all members of the ATCO. The DCATCO would normally have specific supervisory duties only in the absence of the CATCO. As DCATCO, Parrillo's duties primarily involved managing paperwork for the unit. While she did not serve as anyone's formal rating official, she did draft and edit performance reports for the enlisted personnel in the organization.

In the summer of 1987, Parrillo was assigned as acting CATCO for a period of two months. From mid-March through late May 1988, she again served in that direct supervisory position, this time while the CATCO attended Squadron Officer School at Maxwell Air Force Base, Alabama. Parrillo's performance reports praise her skills as a supervisor and give her credit for exercising supervisory authority within the ATCO.

The appellant established personal relationships with several enlisted members of the unit that ultimately led to her court-martial. Neither she nor any of the enlisted men involved were married.

Sergeant Charles Anderson worked in the squadron orderly room. He met Parrillo in November 1986 when she arrived on base. Over the next year and a half, they engaged in sexual intercourse more than 50 times. In early 1987, they smoked a marijuana cigarette together. On one or two occasions, she offered him the opportunity to try cocaine.

From April through June 1988, she had a sexual relationship with Sergeant Todd Tourbin, an air traffic controller in her organization. They engaged in sexual intercourse "six or seven times," including once in his barracks room. Tourbin called Parrillo "Joanne" or "J.P." when they were

---

1. The appellant was tried by general court-martial before a military judge alone. Contrary to her pleas, she was convicted of: signing a false statement in which she denied having used illicit drugs, distribution of cocaine, use of marijuana, having sexual intercourse with two enlisted men over whom she exercised supervisory authority, and solicitation of an enlisted man to use cocaine or ecstasy (a type of "designer drug"), in violation of Articles 107, 112a, 133 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 907, 912a, 933, 934, respectively. She was found not guilty of exporting cocaine from the United States. Her sentence to a dismissal, confinement for 18 months and forfeiture of $2,000 pay per month for 18 months was approved by the convening authority.

off-duty. They discussed the repercussions of their relationship should it become known.

In March 1989, Senior Airman Charles Weaver, an air traffic controller in the unit, was assigned to train Parrillo in flight data and ground control. Over the next two months, they developed a personal relationship, engaging in sexual intercourse about a dozen times. He called her "Joanne" during off-duty hours. They discussed the necessity of keeping the relationship discreet. Weaver says that he fell in love with the appellant; at her court-martial, he testified that they had "talked about" getting married.

When rumors surfaced in the spring of 1988 about Parrillo's activities with enlisted personnel, she was counselled by both her commander and the squadron first sergeant about proper officer/enlisted relationships. Her conduct with Weaver also prompted an Inspector General complaint, when it was alleged that Weaver had been nominated for a special award because of Parrillo's favoritism. The same complaint of partiality was also made to criminal investigators at the local Air Force Office of Special Investigations (AFOSI).

Charged with "wrongfully, dishonorably and disgracefully" engaging in sexual affairs with Tourbin and Weaver,[2] enlisted personnel over whom she "exercised supervisory authority," Parrillo was convicted of two specifications in violation of Article 133, UCMJ.[3] She asserts on appeal that the military judge erred by not granting the trial defense counsel's motion for a

finding of not guilty on this charge. R.C.M. 917. She contends: (1) that she did not have the sort of supervisory relationship to support her conviction on a fraternization charge; and (2) that her conduct was neither dishonorable nor disgraceful.

### A

There was a time—not so long ago—when the criminality of Parrillo's conduct with subordinate enlisted personnel would not be seriously questioned. However, this has not been true since the celebrated case of *United States v. Johanns*, 20 M.J. 155 (C.M.A.1985), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985), *aff'g* 17 M.J. 862 (A.F.C.M.R.1983).

The appellate courts in *Johanns* held that an unmarried Air Force captain was guilty of neither conduct unbecoming an officer (Article 133, UCMJ), nor conduct prejudicial to good order and discipline or of a nature to discredit the armed forces (Article 134, UCMJ), when he engaged in "mutually voluntary, private, non-deviate sexual intercourse with an enlisted member, neither under his command nor supervision." 20 M.J. at 158, *citing* 17 M.J. at 869. At issue in this case is whether Parrillo's behavior fits the *Johanns* scenario.

### B

The appellant was charged with violating Article 133, which simply proscribes, in general language, "conduct unbecoming an officer and a gentleman."[4] Rather than directing itself to any specific crime, it is the deviation from a standard that is made

---

2. The record of trial offers no suggestions as to why the appellant's sexual relationship with Anderson was not charged.

3. Charge III against the appellant consists of the following specifications under Article 133, UCMJ:
   Specification 1: In that FIRST LIEUTENANT JOANNE PARRILLO, United States Air Force, 1979th Communications Squadron, did, at or near RAF Lakenheath and Bury St. Edmunds, Suffolk, England, on divers occasions between 1 April 1988 and 30 June 1988, wrongfully, dishonorably and disgracefully have sexual intercourse with Sergeant Todd C. Tourbin, an enlisted person over whom the said First Lieutenant Joanne Parrillo exercised supervisory authority.

   Specification 2: In that FIRST LIEUTENANT JOANNE PARRILLO, United States Air Force, 1979th Communications Squadron, did, at or near RAF Lakenheath, Suffolk, England, on divers occasions between 6 March 1989 and 17 May 1989, wrongfully, dishonorably and disgracefully have sexual intercourse with Senior Airman Charles S. Weaver, an enlisted person over whom the said First Lieutenant Joanne Parrillo exercised supervisory authority.

4. "Gentleman" is defined to include "both male and female commissioned officers, cadets, and midshipmen." MCM, Part IV, paragraph 59c(1) (1984).

punishable. Charges under Article 133 have long been attacked for ambiguity and vagueness. *See generally* Nelson, *Conduct Expected of an Officer and a Gentleman: Ambiguity,* 12 JAG L.Rev. 124 (1970). The United States Supreme Court has, however, upheld the constitutionality of Article 133, reasoning that an officer may be properly punished for offenses that he has "no reasonable doubt … were both 'unbecoming an officer and a gentleman' and 'to the prejudice of good order and discipline in the armed forces.'" *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *see Johanns,* 17 M.J. at 867.

Judge Cox has stated that "Article 133 gives every commander the tool he needs to test the conduct of officers serving within his command." *United States v. Wales,* 31 M.J. 301, 312 (C.M.A.1990) (Cox, J., dissenting in part; concurring in result). We agree. We caution, however, that Article 133 offers no panacea from proof for fraternization offenses.

■ An offense may be properly charged under Article 133 even when the misconduct is specifically punishable by another article. *See* MCM, Part IV, paragraph 59c(2) (1984). In such a case, the elements of proof for the Article 133 offense are the same as those required for the underlying offense, "with the additional requirement that the act or omission constitutes conduct unbecoming an officer and a gentleman." *Id.* Thus, the government has an additional element to prove when it charges a traditional fraternization offense under Article 133 instead of Article 134. *See also United States v. Court,* 24 M.J. 11 (C.M.A.1987); *United States v. Ramirez,* 21 M.J. 353 (C.M.A.1986); *United States v. Timberlake,* 18 M.J. 371 (C.M.A. 1984).

The appellant's liaisons with enlisted members of her unit fall within the traditional understanding of fraternization, an offense specifically punishable under Article 134. MCM, Part IV, paragraph 83 (1984). One element of proof for fraternization is that a "custom of the accused's service" has been violated.[5] *Id.* at paragraph 83b(4). The vitality of the Air Force custom against fraternization has lately been questioned by some military courts. *See generally* Mahoney, *Fraternization: Military Anachronism or Leadership Challenge?,* 28 A.F.L.Rev. 153 (1988). In *Johanns,* for example, the Court of Military Appeals deferred to this Court's determination "that no custom of [the Air Force] prohibited Captain Johanns' private sexual relationships with several enlisted women." 20 M.J. at 160.

■ In this case, the government chose not to charge the alleged misconduct as a traditional fraternization offense under Article 134. *See* MCM, Part IV, paragraph 83f (1984). This is acceptable; we specifically decline to hold that a charge under Article 133 is subsumed or preempted whenever the offense could also be alleged under another article. Conversely, misconduct that is not expressly forbidden by other punitive articles may be successfully prosecuted under Article 133, provided it constitutes "conduct unbecoming an officer and a gentleman." *See United States v. Scott,* 21 M.J. 345, 350–352 (C.M.A.1986) (Cox, J., concurring); *United States v. Shober,* 26 M.J. 501 (A.F.C.M.R. 1986). In such a case, it is incumbent on the government to prove that the accused was on fair notice of the criminality of his conduct. *Parker v. Levy,* 417 U.S. at 755, 94 S.Ct. at 2561, 41 L.Ed.2d at 457; *Johanns,* 20 M.J. at 158. In the absence of a regulation on point, proof that the appellant was on notice of applicable standards can come from showing that a custom of the service has been violated. *See, e.g., United States v. Appel,* 31 M.J. 314, 320 (C.M.A.1990); *Johanns,* 20 M.J. at 158–161; *United States v. Pitasi,* 20 U.S.C.M.A. 601,

---

5. Rather than having to prove a custom, another option has been suggested by appellate courts. The government could promulgate a general regulation "prohibiting those relationships between officers and enlisted persons, which, in the view of [the Air Force, are] harmful to good military discipline." *Wales,* 31 M.J. at 306. We note that after the trial of the case at bar, Air Force Regulation 35–62, *Policy on Fraternization and Professional Relationships* (16 April 1990), was published. That regulation is a nonpunitive statement of Air Force policy.

605–608, 44 C.M.R. 31, 35–38 (1971). Here, the prosecution's Article 133 case was based on the allegation that Parrillo had sexual intercourse with enlisted subordinates *over whom she exercised supervisory authority.* We must determine whether a custom of the Air Force governs the alleged misconduct.

### C

■ We find as a matter of fact that a commander or supervisor who fraternizes sexually with someone under his command or supervision clearly violates a long-standing custom of the Air Force. In a thoughtful article that presaged *Johanns,* the evolution of fraternization in the Air Force was examined. Flatten, *Fraternization,* 10 A.F. Reporter 109 (1981). Dispensing advice that remains cogent, the author concluded that: "Enforcement under the UCMJ of the custom against fraternization is very doubtful ... *[except] in the case of a commander or supervisor who fraternize[s] with a subordinate." Id.* at 114–15 (emphasis added); *see also* Air Force Regulation 35–62, *Policy on Fraternization and Professional Relationships* (16 April 1990), paragraph 2b(1).

■ Our holding today is consistent with the implicit recognition in *Johanns* that a criminal prosecution *is* available when an officer engages "in mutually voluntary, private, non-deviate sexual intercourse with an enlisted member" who *is* "under his command or supervision." 17 M.J. at 869. The Court of Military Appeals recently upheld the conviction of an Air Force officer for fraternization offenses (charged under Article 134), wherein a supervisory (command) relationship was alleged and proved. *Appel,* 31 M.J. 314. A broadly-worded definition of the necessary "supervisory" relationship was provided when the Court quoted with favor the trial judge's explanation:

that the enlisted member [must] be subordinate in assignment, plus there must be a duty relationship which regularly or recurringly calls for or may call for direction, oversight, correction or evaluation of the enlisted member by the officer. It is not required that there be a

formal supervisory or command relationship between the two, even though in this case that is in fact what is alleged. *Id.* at 317. Clearly, Parrillo's relationships with Tourbin and Weaver meet this description of a supervisory relationship.

In addition to the periods of time during which she served as the acting CATCO, the appellant continuously maintained general supervisory responsibilities over subordinate personnel in her organization (especially considering the fact that she was one of only two officers in the unit). Her on-duty supervision was unequivocally compromised by her off-duty amorous relationships. Parrillo's surreptitious liaisons with subordinates undermined the perception of fair and even-handed supervision within her unit. The complaint over the award nomination for one of her paramours shows that the relationship caused at least an appearance of partiality, one of the evils against which fraternization-type offenses are designed to guard. MCM, Part IV, paragraph 83c(1) (1984).

We are convinced that the appellant knew that her off-duty conduct with Tourbin and Weaver was wrong. She was aware of the Air Force custom in this area. *See United States v. Mayfield,* 21 M.J. 418 (C.M.A.1986). She emphasized the need for her sexual partners to be discreet about their relationship. They discussed possible repercussions if the relationships became known. Even after she had been counselled on proper officer/enlisted standards by both her commander and the squadron first sergeant, she continued to engage in sexual relations with subordinates. The individuals with whom she engaged in the most intimate and personal of off-duty contacts apparently observed appropriate military courtesies with their superior commissioned officer when on duty. The distinction between "Lieutenant Parrillo" and "J.P."—and all that was connoted with the change of appellation—signifies the difference between proper military relationships and criminal misconduct.

The appellant's sexual relationships with enlisted men over whom she exercised supervisory authority were properly prose-

cuted under Article 133. The government proved that she violated a long-standing custom of the service. We too find that her conduct was "wrongful, dishonorable, and disgraceful," as charged. The supervisory relationship between the appellant and her subordinates establishes the aggravating factor which makes fornication an offense in this case. *Johanns*, 17 M.J. at 868.

## II

In her second assigned error, the appellant asserts that the military judge erred by not granting a motion to suppress evidence relating to the charge that she had distributed cocaine. The motion concerned a telephone conversation between Parrillo and Anderson, who was then cooperating with the AFOSI. We find that the evidence was properly admitted.

On 25 April 1989, an enlisted member of the appellant's unit contacted AFOSI investigators to report that Parrillo and Anderson were involved with illegal drugs. When Anderson was questioned the next evening, he acknowledged that he had had a sexual relationship with Parrillo. He told the investigators that he believed she had also been sexually involved with Tourbin and Weaver. Ultimately, he admitted that he had used marijuana with Parrillo, and he said that she had invited him to use cocaine with her.

At the direction of the AFOSI, Anderson tried to call Parrillo on 27 April to ask if she had any cocaine that she could provide to him. Prior to making the call, the investigators had received guidance from the base legal office. They were specifically cautioned about entrapment, and Anderson was instructed on how to conduct the conversation. The AFOSI investigators would have listened to the call on a telephone extension, but the base phone system did not permit use of extensions in that manner. The agents decided to listen along with Anderson on his receiver. After several tries, he was unable to contact Parrillo on 27 April.

Anderson called Parrillo on the phone from the AFOSI office on the afternoon of 28 April. The call was made from a phone that was normally used by one of the investigators. Anderson consented to have the investigators monitor his conversation. He held the phone in a position that enabled them to listen to the conversation as it occurred. One of the investigators was "only inches" from Anderson, while the other was also close enough to hear the conversation and make notes. The conversation was not otherwise recorded.

During the telephone conversation of 28 April, Anderson asked Parrillo if she still had the "blow" (cocaine). Parrillo eventually told Anderson that she did have some, but she did not have immediate access to it. She arranged to place the cocaine in Anderson's on-base military postal center box within the next few days. Before ending the phone conversation, she confirmed both the box number and combination to the lock, which he had given to her earlier in their relationship. At no point did Anderson advise Parrillo of her rights under Article 31, 10 U.S.C. § 831. On 30 April, she placed an envelope in his mailbox. The envelope contained less than half a gram of cocaine.

In a pre-plea motion, the trial defense counsel sought to suppress all evidence received and derived from the 28 April telephone conversation. Mil.R.Evid 311(d)(2)(A). Appellate defense counsel assert that the military judge erred in denying that motion. They urge that monitoring the telephone call was illegal for two independent reasons: (1) the interception of the conversation did not comply with regulatory guidelines; and (2) Anderson failed to advise Parrillo of her Article 31 rights before he asked questions that were designed to incriminate her.

■ The initial argument of appellate counsel refers to Military Rule of Evidence 317(c)(2), which provides that an interception of a wire communication is subject to suppression when the interception takes place outside the United States and does not comply with applicable regulations. The relevant regulations are contained in 18 U.S.C. §§ 2510–2520; 32 C.F.R. Part 42; and Air Force Regulation 124–18, *Techni-*

*cal Surveillance Activities for Law Enforcement Purposes* (27 September 1984).

We find that Anderson consented to have the investigators listen to his conversation with Parrillo, and that no unlawful interception occurred. The term "interception" is defined as the "aural acquisition of the contents of any wire or oral communication *through the use of any electronic, mechanical, or other device.*" 32 C.F.R. § 42.6(f) (emphasis added). *See also* 18 U.S.C. § 2510(4); AFR 124–18, paragraph 1(f). In this case, the normal hearing faculties of the investigators were used to listen to the telephone conversation between Parrillo and Anderson.

The telephone that received "aural communication" in this case was an ordinary, regularly-installed phone normally used for day-to-day calls at the AFOSI. *See* 18 U.S.C. § 2510(5)(a); 32 C.F.R. § 42.6(e); AFR 124–18, paragraph 1(e). In his essential findings,[6] the military judge determined that "[s]uch regular use of installed telephones solely in conjunction with the ears of one or more third parties (with the consent of one of the knowing parties to the conversation) does not constitute an 'interception.'" We agree. The investigators merely monitored a conversation, with the consent of one of the parties, by listening in through non-technical means. Since no interception occurred, the threshold criterion of Mil.R.Evid. 317(c)(2) was not met. *See United States v. Sturdivant*, 13 M.J. 323 (C.M.A.1982).

■ The military judge's denial of the motion on Article 31 grounds was also proper. Prior to the telephone conversation of 28 April, Parrillo and Anderson had been lovers. They had used marijuana together, and she had invited him to use cocaine with her. The conversation was

merely a follow-up to an offer that she had previously made to him.

We find that at the time of the call, Anderson was acting as an agent for the AFOSI investigators. *See United States v. Rollins*, 23 M.J. 729, 733 (A.F.C.M.R.1986), *pet. denied*, 24 M.J. 207 (C.M.A.1987). The case of *United States v. Duga*, 10 M.J. 206 (C.M.A.1981), holds that Article 31 warnings are not required unless a suspect is questioned in an official capacity *and* the suspect perceives the questioning to be official in nature. 10 M.J. at 211. Here, the questions were asked in an official capacity, but Parrillo perceived the telephone call as casual conversation with a friend.

Under the guidance of AFOSI, Anderson engaged in a routine and permissible undercover technique that confirmed the predisposition of Parrillo to distribute cocaine. He was not required to provide any rights warnings before asking questions that elicited an incriminating response. Parrillo's admissions were wholly voluntary and are not protected by the Fifth Amendment or Article 31. *Illinois v. Perkins*, 495 U.S. ——, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Duga, supra; United States v. Flowers*, 13 M.J. 571 (A.C.M.R.1982).

### III

■ The appellant next maintains that her sentence is unduly severe. Her appellate counsel assert that she "is a first time offender and, aside from the circumstances that resulted in her conviction, she enjoyed an exemplary military record." In fact, virtually from the time the appellant arrived at her first duty assignment following training, she engaged in a course of reprehensible conduct.

---

6. The military judge did not provide the rationale for his essential findings at the time he announced his ruling, opting instead to attach a memorandum of his ruling as an appellate exhibit before authenticating the record of trial. While *special findings* may be rendered at any time before authentication (R.C.M. 918(b)), the basis for *essential findings* under Mil.R.Evid. 311(d)(4) should be explained at the time the ruling is made. *See* R.C.M. 905(d); *United*

*States v. Postle*, 20 M.J. 632, 640 (N.M.C.M.R. 1985). In this case, the trial defense counsel specifically asked that the essential findings be announced before pleas were entered, but the judge declined to do so. However, since specific prejudice (*e.g.,* the desire for an interlocutory appeal) has neither been asserted by counsel nor ascertained in our review, we find the error here to be harmless. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

Lieutenant Parrillo provided a false statement about her use of drugs; she distributed cocaine to an enlisted member of her organization; she used marijuana with an enlisted subordinate; she solicited an enlisted member of her unit to use cocaine; and she dishonorably engaged in sexual relations with enlisted members of her organization. Her approved sentence to a dismissal from the service, forfeiture of $2,000 pay per month for 18 months, and confinement for 18 months is entirely appropriate. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

## IV

During our initial review of this case, we discovered that it was not clear from the record whether the convening authority had reviewed the clemency matters submitted by the appellant before he took action. The addendum to the staff judge advocate recommendation merely described the appellant's clemency submissions, but did not indicate if the submissions were included with the addendum or informed the convening authority that he was required to consider the submissions before taking his action.

 A staff judge advocate's recommendation or addendum should make it clear to the convening authority that he is required to consider matters submitted by an accused under R.C.M. 1105(b) or R.C.M. 1106(f)(4). *United States v. Craig*, 28 M.J. 321 (C.M.A.1989); *United States v. Pelletier*, 31 M.J. 501 (A.F.C.M.R.1990); *United States v. Foy*, 30 M.J. 664 (A.F.C.M.R. 1990). The convening authority has a statutory duty to consider these matters personally. Article 60(c)(2), UCMJ, 10 U.S.C.A. § 860(c)(2).

We ordered the government to show cause why the action of the convening authority was not premature. They provided us with an affidavit from the convening authority that makes it clear that he reviewed all the matters submitted by the appellant prior to taking his action. We are satisfied that the convening authority's action was timely and proper, and that the inadequacy of the addendum did not result in prejudice to the appellant. Article 60(c)(2), UCMJ; R.C.M. 1107(b)(3)(A)(iii).

\* \* \* \* \* \*

The findings and sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Senior Judges LEONARD and MURDOCK concur.