UNITED STATES, Appellee,

v.

Richard M. SANDOVAL, First Lieuten-
ant, U.S. Army, Appellant.

No. 40,717.
CM 439327.

U.S. Court of Military Appeals.

June 18, 1984.

For Appellant: *Captain Guy J. Ferrante* (argued); *Colonel Edward S. Adamkewicz, Jr., Major James F. Nagle, Captain John D. Martin* (on brief); *Colonel William G. Eckhardt, Captain Thomas J. Feeney.*

For Appellee: *Captain Kurt J. Fischer* (argued); *Colonel R.R. Boller, Lieutenant Colonel John T. Edwards, Captain Paul K. Cascio* (on brief); *Colonel James Kucera, Major Joseph A. Rehyansky, Major Ted B. Borek, Captain Rexford T. Bragaw, III.*

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial composed of officers sitting at Fort Hood, Texas, convicted appellant of a charge of conduct unbecoming an officer and gentleman, in violation of Article 133, Uniform Code of Military Justice, 10 U.S.C. § 933. The single specification alleged that he "did ... wrongfully commit an indecent, lewd, and lascivious act with Specialist Five Mariko H. Anso, by kissing her, putting his fingers on her chest and placing his fingers under her panties." Appellant was sentenced to dismissal, and the convening authority approved the findings and sentence. After the Court of Military Review affirmed the approved findings and sentence, we grant-

ed appellant's petition for review on this issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY ALLOWING MR. IDE TO TESTIFY CONCERNING AN ALLEGED FRESH COMPLAINT BY THE VICTIM.

I

After receiving a report of misconduct and interviewing appellant, his unit commander, Major David L. Wilson, initially recommended that the matter be disposed of by nonjudicial punishment under Article 15, U.C.M.J., 10 U.S.C. § 815. However, upon conferring with a superior, Wilson decided to prefer the charge—which then was referred for investigation under Article 32, UCMJ, 10 U.S.C. § 832. Noting in his report that Specialist "Anso was very confused and disoriented during her testimony and during the alleged incident," the investigating officer concluded:

Evidence and testimony show that 1LT Sandoval's actions were improper but not morally unbefitting and unworthy and therefore do not constitute conduct unbecoming an officer and a gentleman. I recommend that charges under Article 133, UCMJ be dropped. I further recommend that the Commander, Division Support Command, reprimand 1LT Sandoval, in writing for his impropriety and poor judgment.

In turn, the pretrial advice of the staff judge advocate recommended to the convening authority "[t]hat ... Sandoval be punished pursuant to Article 15, UCMJ, level: Field Grade." Nonetheless, the charge was referred for trial by general court-martial.

Prior to trial defense counsel submitted various motions for appropriate relief, which were heard in an Article 39(a)[1] session. Among the motions was one "in the nature of a motion in limine to suppress the testimony of any witnesses who would tes-

tify that Specialist Anso, the alleged victim, complained to them of sexual advances made on the part of 1LT Richard M. Sandoval." In support of this motion, trial defense counsel observed that the incident had not been reported by Specialist Anso to her superiors for approximately two weeks after its alleged occurrence, and the argument was made that "[s]uch statements are hearsay and would not constitute Fresh Complaint under the provisions of" paragraph 142c of the Manual for Courts-Martial, United States, 1969 (Revised edition).[2]

The military judge denied this motion but remarked that "the court will be instructed on the question, they determine whether or not a fresh complaint was made." He added that "they'll be so instructed that they have to disregard it if they determine it was not a fresh complaint under the circumstances." Also, the judge stated that "the court members are instructed that it's not a matter that they may use to determine facts in the case; it's merely corroboration."

The Government's first witness was Specialist Five Mariko Anso. She knew Sandoval, with whom she worked, and she knew "his wife a little bit better." At about 5:30 p.m. on August 15, 1979, Anso reported to the orderly room of her organization, where appellant's office was located. He "was trying to offer me some assistance in applying for OCS and he said he had some information and guidance that he could give me." The witness testified that, after they "began to discuss my application for OCS," these events occurred:

Well, he assumed the role of a TAC—an OCS instructor of some kind and he went through some various situations, then he told me to take my fatigue jacket off—shirt to show me where my name had to be stencilled on my T-shirt and I told him I didn't have to be shown because I thought I knew it. And he said, go ahead and take it off, that he wanted to make sure I knew about it. He came around his desk and he had a ruler, I

---

1. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

2. The case was tried before the Military Rules of Evidence took effect.

think, and he put it up against my breasts and touched my breasts and said this is exactly the position and he said I wouldn't have too much difficulty in having my name stencilled since it was so short. It was very easy to center it.

\* \* \* \* \* \*

I was sort of embarrassed and flustered, I guess would be the word, and I told—I just said, sir, I'm embarrassed, and then he said, don't worry, you know Connie, we're married and don't worry, I'm not making a pass at you.

Appellant's hands had touched her breast while this was going on; and after telling him that she was embarrassed, Anso had put her shirt back on. According to her, "Well, as I was putting my shirt back on, I was kind of flustered, and I fumbled the—he looked at me and said something about my bra, what was on it, some sort of tag or something on it." Then, after Sandoval "went around to his desk and sat down," he said that

because I was losing the weight that my fatigues didn't fit very well and that I would have to get them form fitting as such and I said I was going to buy some new ones. And he said—he came around his desk and said that—he was trying to show me that because my uniform was so baggy at various places where I would have to have it tailored or taken up or something. And he grabbed at my pants' leg to try and pull it together and show how it was supposed to be and he had me grab my pants up to bring it down because it was hanging so low.

She pulled up her pants, as Sandoval had directed, whereupon

[h]e said something about I wasn't doing it right or grabbing it right and he told me to put my hand inside my pants, grab it this way, and I tried to do that, and he said, no, I wasn't doing it right, and he just sort of quickly put his hands inside my pants to grab it up.

Specialist Anso testified that while appellant's hands were inside her pants, they

were underneath her underwear and his finger penetrated her vagina. At that moment,

I jumped back and I was very flustered. That's when I realized that he was making a pass at me and ... He—I think he knew I was very shocked. He said that, sort of jokingly, I'm sorry, you can't blame a guy for trying, and he kind of came closer to me, stood up a little bit and kind of kissed me, he curled his lip back or something.

Anso did not report these events immediately, because "I was scared, confused. I was hoping that if I tried to pass it off and forget about it and he would too." However, finally she "reported it the day he called me up for a luncheon date and I just knew that he did this, I had to do something to stop the situation."

On cross-examination, the witness acknowledged that "this was not the first time that" she had talked to appellant "about OCS" and that she had "voluntarily go[ne] to [his office at] the orderly room." She was aware that other persons were working in the building, although she had not known "that ... Sandoval's wife [3] was upstairs in the same building" "until he told ... [Anso] when ... [she] was trying to leave." When appellant "touched ... [her] breast with his fingers," she had not thought "that he was making a pass at ... [her] or any kind of sexual advance." Instead, she had believed that "it was an inadvertent touch on his part" while he was "demonstrating the proper location of ... [her] name" on her shirt.

With respect to Sandoval's remarks that her pants should fit on the lower body, the witness conceded that she had lost fifteen pounds and that, since her pants had not been taken in at the waist, they were baggy and low-hanging. With one hand Anso had reached down to her crotch to grab "the excess material" in her pants. Everything had "happened so fast," but Sandoval had told her "throughout this incident that he wasn't making a pass at ... [her] and

3. Like Specialist Anso, appellant's wife was an enlisted person.

not to worry." In "demonstrating the harrassment ... [she] would receive from a TAC in OCS he was standing very close to" her "[a]nd he was calling commands to ... [her] and pointing out deficiencies in ... [her] uniform."

During this incident she was "disoriented," and her "mind was hopping" to "traumatic experiences" which had occurred when she was "five years old and ten and eleven." She waited approximately two and a half weeks to report the incident to anyone and then she reported it to Mr. Ide, her superior. The following day she also reported it to her husband. During the encounter with Sandoval, she was always free to leave, and instead of running out of the room, she was escorted to the door by appellant. After this incident, appellant "came by ... [her] office several times ... to discuss various things to do with the company and my section." Specialist Anso also acknowledged that men flirted with her "sometimes," and she conceded that at the Article 32 investigation she could have said that they flirted with her "at least three times a day."

On redirect, Anso explained that she had delayed in reporting the incident, because "I was scared and confused, I felt sorry for Connie [appellant's wife], I felt sorry for myself. I put myself in the situation if I was Connie, if something like this came out how I would be—"

The second government witness, Chief Warrant Officer Harry Ide, testified that Specialist Anso "came to my office during my lunch hour and asked to just talk." The "conversation started that she had problems, emotional problems, she'd just like to talk with me about it, if I didn't mind interrupting my lunch hour." According to Ide,

she started talking about, in general, that she had been having problems in this section. And I said, well I didn't understand all that. Then that led into— she said, well, really what it comes down to is I don't know how to discuss a problem with my husband. And I said, well, go ahead, if you feel that I can help you.

She says, well, a man has made a pass at me. Well, that's not a bit unusual, I said, I'm sure you had several. She said, well, I don't mean passes like the GIs here in the office do, or just a verbal pass. She said, one of the men had put their hands on me.

Despite the judge's invitation for him to do so, trial counsel did not seek to elicit from Ide any further details about Anso's report to him.

After this witness testified and the Government rested, the defense moved for a finding of not guilty on the ground "that a conviction for a sex offense cannot be based on the uncorroborated complaint of the victim when her testimony is imprecise, incomplete, improbable, or inconsistent." *See* para. 153*a*, Manual, *supra*. However, the judge ruled that Anso's "testimony ... [was] sufficient to establish a prima facie case of the offense."

Next, defense counsel presented testimony of several witnesses as to appellant's good character and fine military record. When the defense called a witness who, on the basis of his acquaintance with Specialist Anso, felt "that she's somewhat of a flirt," the judge observed:

This is not a consensual situation. If she's a flirt or not, the fact is even though what took place allegedly—it's not a question of whether or not the acts occurred, but because it constitutes unbecoming an officer [sic]. The question of consent is not involved.

The judge added that, while consent "might be [involved] in extenuation and mitigation, ... on the merits of this case, the question is if the acts in fact took place." However, the defense witness was allowed to testify that, in his opinion, Anso's "character for truth and veracity" was "not very good."

In connection with some other proposed defense evidence as to Specialist Anso's behavior, the judge reemphasized: "[T]his is not a sex case, really, although it has certainly overtones of that; now in a sex case evidence of prior unchaste character is admissible not only to show a lack of consent or consent—a want of lack of consent,

but also as it affects the credibility of the witness"; but then the judge added that "this case although not really a sex case is closely akin to a sexual assault case."

The judge did allow a defense witness, Private Kevin Thomas, to testify that he had been "offered an Article 15 for an assault in which Specialist Anso said that ... [he] had assaulted her"; and after "a hearing before the commander concerning the Article 15," he was "found not guilty of that assault." In the cross-examination of Thomas by trial counsel, he explained that, while Anso was breaking up a fight between him and another person, "there was some comment made about you having put your hand on her or something"; but "there was [not] any sexual thing involved."

After the defense rested, the Government called in rebuttal Lieutenant Colonel Gerald Stanley, who expressed his opinion that Sandoval's character was "[q]uestionable." Chief Warrant Officer Ide, recalled as a rebuttal witness, voiced his opinion that appellant was "not an officer."

When all the evidence was in, the judge conducted an Article 39(a) session to discuss instructions. The defense requested that he advise the members as to "[l]ack of fresh complaint" and also asked for an "instruction on sex offense testimony of an alleged victim, noting however, that this is not a sex offense but analogous to one."

In his opening argument trial counsel sought, among other things, to explain Anso's delay in reporting the incident. To the contrary, defense counsel argued that, if the incident had been serious "or if it even happened at all," Specialist Anso would not have waited two and a half weeks to report it. Later in his argument, defense counsel contended, "The first thing you should consider is the lack of corroboration."

In advising the court members, the judge emphasized that "this is not an assault case. Therefore, whether or not the alleged victim in this case, Specialist Anso, consented to these acts is not an issue before you." Subsequently, the judge gave this instruction:

Now, although this is not strictly a sex assault offense in the legal technical term that that is used, it is—does by implication or the evidence involved sexual activity.

Now, the law provides in cases like this that you examine closely the testimony of the alleged victim in this case, Specialist Anso, and that a conviction for the offense alleged, that being indecent acts unbecoming an officer, cannot be based on the uncorroborated testimony of the alleged victim if that testimony is self-contradictory, uncertain, or improbable. Now, you are the ones to determine whether the testimony is of that nature. In making your determination as to whether the testimony is self-contradictory, uncertain, or improbable, you must consider it in the light of all the instructions concerning factors bearing on a witness' credibility, which I will shortly give you. In deciding whether or not the testimony of Specialist Anso has been corroborated, you must examine all the evidence in the case with a view to determining if there is other evidence which is of itself is of a substantial and confirming nature tending to connect the accused with the commission of the offense. If there is such evidence, then her testimony would be corroborated. If not, then there would be no corroboration. Now, on the question of corroboration, evidence of fresh complaint or lack thereof is admitted solely for its bearing, if any, on the credibility of the complaining witness, that being Specialist Anso. Now, in this case, you've heard Mr. Ide come in and testify that some two and a half weeks after the alleged incident occurred that Specialist Anso did come to him with a report about some incident relating to an individual placing his hands on her body. Now, you are advised that a fresh complaint is one that is made within a reasonably short time after the event occurs, considering all of the circumstances. For example: a person in a state of shock, surprise, or ex-

citement might not reasonably be expected to complain until after the effects of such state have worn off.

Now, there is evidence, of course, of a delay of the alleged victim to make known the alleged offense against her, after her first reasonable opportunity under the circumstances. This delay is a proper factor for your consideration and it may seriously affect the credit to be given to Specialist Anso's testimony. Indeed, the failure to complain promptly may under the circumstances justify an inference against the sincerity of the complaint and against the reliability and the trustworthiness of the alleged victim's testimony. It is for you as members of the court to determine whether or not under the circumstances of this particular case the report to Mr. Ide did constitute a fresh complaint.

## II

The evidentiary rules which applied to sexual offenses under Manual for Courts-Martial, United States, 1969 (Revised edition), and Manual for Courts-Martial, United States, 1951, were quite different from those now applicable under the Military Rules of Evidence. In both Manuals, corroboration was required if the testimony of the "alleged victim" of the "sexual offense" was "self-contradictory, uncertain, or improbable." *See* para. 153*a*, 1969 Manual, *supra*; para. 153*a*, 1951 Manual, *supra*. Indeed, the 1969 Manual even provided (para. 153*a*) that "[w]hen appropriate" and "upon request by the defense," the requirement of corroboration "should ... be included in the general instructions of the military judge." On the other hand, the Military Rules of Evidence contain no requirement of corroboration for such offenses.

The 1969 and 1951 Manuals contained a paragraph, located in the portion of the Manual discussing hearsay exceptions, which authorized the reception of evidence of "fresh complaint." *See* para. 142*c*, 1969 Manual, *supra*; para. 142*c*, 1951 Manual, *supra*. The Military Rules of Evidence make no separate provision for "fresh complaint," although, according to the Draftsmen's Analysis, Appendix 18, 1969 Manual, *supra*, (hereafter cited as Analysis), "[r]ule 801*d* (1)(B) provides a possible means to admit evidence of fresh complaint in prosecutions of sexual offenses."

A close relationship exists between the erstwhile Manual requirement for corroboration of the testimony of the victim of a sexual offense and the Manual authorization for reception of the evidence of the victim's fresh complaint, since the fresh complaint may provide the necessary corroboration for the victim's testimony at trial. Perhaps, as one court has suggested, judicial development of the rule allowing proof of fresh complaint was "premised on the *necessity* for admitting the fact of complaint in sex crimes, because of the unique requirement that the sex crime be corroborated." *Fitzgerald v. United States*, 412 A.2d 1, 8 (D.C. Ct. App. 1980). Thus, there would have been little occasion for the Military Rules of Evidence to have eliminated only the corroboration requirement and retained the provision for fresh complaint—or vice versa.

In dealing with fresh complaint, the 1969 Manual stated that "[s]exual offenses include all offenses of a sexual nature, such as rape, carnal knowledge, sodomy, attempts to commit these offenses, assault with intent to commit rape or sodomy, and indecent assaults or acts." The corresponding paragraph of the 1951 Manual used the same examples, although it lacked any statement about inclusion of "all offenses of a sexual nature." However, neither edition of the Manual defines "sexual offense" in discussing corroboration of an alleged victim thereof. *See* para. 153*a*, 1969 and 1951 Manuals, both *supra*. Presumably, in view of the close relationship of fresh complaint to corroboration, the draftsmen of each Manual intended that "sexual offenses" would have the same meaning for purposes of the corroboration requirement that the term was given with respect to evidence of fresh complaint.

■ a. *Spontaneous Exclamation.* If the alleged sexual offense is "a startling event" and the victim promptly makes an utterance concerning the circumstances, this may constitute a fresh complaint. However, if the utterance occurred "while [s]he was in such a condition of excitement, shock, or surprise, caused by ... [her] participation in or observation of the event, as to warrant a reasonable inference that [s]he made the utterance as an impulsive and instinctive outcome of the event, and not as a result of deliberation or design," it would also be "a spontaneous exclamation" —"sometimes called *res gestae.*" *See* para. 142*b*, 1969 Manual, *supra.* Under the express language of the 1969 Manual paragraph and judicial interpretations of its predecessor, there must be "independent evidence of the startling event which gave rise to" the exclamation "and of an opportunity on the part of its maker to observe the event." Para. 142*b*, 1969 Manual; *United States v. Mounts,* 1 U.S.C.M.A. 114, 2 C.M.R. 20 (1952); *United States v. Cox,* 11 M.J. 795 (A.F.C.M.R.), *pet. denied,* 12 M.J. 115 (1981); *United States v. Huff,* 4 M.J. 816 (A.C.M.R.), *pet. denied,* 5 M.J. 207 (1978).

■ Spontaneous exclamations are exceptions to the hearsay prohibition and may be proved either by the person who made the utterance or by someone who heard it. Thus, all the details of the spontaneous exclamation may be received in evidence, and admissibility does not depend on calling as a witness the person who made the statement. Similar principles apply under Mil.R.Evid. 803(2) (*Excited utterance*), but it does not expressly "require independent evidence that the startling event occurred." *See* Analysis of Mil.R.Evid. 803(2).[4]

■ b. *Prior Consistent Statement.* Regardless of the lack of spontaneity of a prior statement made by a witness—including the alleged victim of a sexual offense— under some circumstances that statement was admissible to corroborate his testimony. *See* para. 153*a*, 1969 and 1951 Manuals, both *supra.* However, unlike "spontaneous exclamations," a prior consistent statement could only be received in evidence if the witness had testified. Moreover, under both the 1969 and 1951 Manuals, only "[i]f the testimony of ... [the] witness ha[d] been attacked on the ground that it was due to a certain influence, [would] evidence of his statements or conduct, consistent with his testimony, made or occurring before the creation of that influence" be admissible. Para. 153*a*, 1969 and 1951 Manuals, both *supra.* Cross-examination of the witness, even though searching, was not sufficient to constitute an attack within the meaning of this requirement. *See United States v. Kellum,* 1 U.S.C.M.A. 482, 4 C.M.R. 74 (1952); 4 Wigmore, *Evidence* § 1136 (Chadbourn rev. 1972). No limitation would exist as to offering the details of the prior statement, so long as those details were consistent with and tended to corroborate the testimony of the witness.

Prior consistent statements receive a very different treatment under the Military Rules of Evidence. For one thing, a prior consistent statement that meets the requirements of Mil.R.Evid. 801(d)(1)(B) is not hearsay, so it constitutes substantive evidence, instead of merely evidence supporting the credibility of the witness.[5] Secondly, while the condition for admissibility is that the prior consistent statement be "offered to rebut an express or implied charge against the declarant of recent fa-

---

**4.** *See also* Mil.R.Evid. 803(1) (*Present sense impression*), which the Draftmen's Analysis, Appendix 18, Manual for Courts-Martial, United States, 1969 (Revised edition), states

    is taken from the Federal Rule verbatim. The exception it establishes is not now recognized in the Manual for Courts-Martial. It is somewhat similar to a spontaneous exclamation, but does not require a startling event. *A fresh complaint by a victim of a sexual offense may*

    *come within this exception depending upon the circumstances.*
(Emphasis supplied).

**5.** Some question exists as to the admissibility of a prior consistent statement established by a witness other than the person who made the statement. *See* P. Rothstein, *Evidence in a Nutshell: State and Federal Rules* 164–65 (1981).

brication or improper influence or motive," Mil.R.Evid. 801(d)(1) does not require that the statement precede the occurrence of the influence.[6] Finally, there is no explicit requirement in this Rule that the testimony of a witness must have been "attacked."

c. *Fresh complaint.* Although both the 1969 and the 1951 Manuals recognized "fresh complaint," they differed somewhat as to its treatment. In the 1969 Manual, paragraph 142c bore the heading, *"Fresh complaint and lack of fresh complaint."* In the 1951 Manual, neither the heading nor the text of that paragraph referred to "lack of fresh complaint," but cases decided under this Manual recognized the relevance in some situations of evidence that there had been no fresh complaint and the entitlement of the accused under some circumstances to an instruction on lack of fresh complaint. *See, e.g., United States v. Goodman*, 13 U.S.C.M.A. 663, 33 C.M.R. 195 (1963); *United States v. Mantooth*, 6 U.S.C.M.A. 251, 19 C.M.R. 377 (1955).

The 1969 Manual required that the complaint be made "within a reasonable time after" the sexual offense was allegedly committed, while its predecessor referred to a complaint "within a short time thereafter." *See* para. 142c, 1969 and 1951 Manuals, both *supra*. Presumably, this change in language was intended to include situations where the requirement of complaint "within a short time" would have been too restrictive. For example, the victim might have been unconscious for a period of time after the offense, or there might have been special circumstances, such as the existence of threats, duress, or fear of reprisals, which made the delay in complaining seem quite reasonable. *Cf. State v. Twyford*, 86 S.D. 522, 186 N.W.2d 545 (1971); *People v. Bonneau*, 328 Mich. 237, 35 N.W.2d 161 (1948); *State v. Crissman*, 31 Ohio App.2d 170, 287 N.E.2d 642 (1971).

The 1969 Manual authorized the reception of evidence of fresh complaint if "an alleged victim of either sex has testified that consent was lacking" and "whether or not lack of consent is an element of the offense." The 1951 Manual contained no explicit provision of this sort, so it left some room for the argument that fresh complaint is inadmissible in a prosecution for an offense where lack of consent is not an element of the crime. *See United States v. Goodman, supra;* cf. Wigmore, *supra*, § 1135. However, because the 1951 edition of the Manual "authorized proof of fresh complaint 'in prosecutions for sexual offenses,' and expressly included within the term crimes of the nature of sodomy and carnal knowledge in which lack of consent is not an element," this Court reasoned that evidence of fresh complaint was admissible in cases where consent was not an element of the offense. *United States v. Mantooth, supra* at 255, 19 C.M.R. at 381; *see United States v. Goodman, supra* at 669, 33 C.M.R. at 201.

The 1951 Manual stated that "[e]vidence of fresh complaint, as such, is received *solely* for the purpose of corroborating the testimony of the victim and not for the purpose of showing directly the truth of the matters stated in the complaint." (Emphasis supplied). This language conformed to the theory that the fact of fresh complaint is admissible because otherwise the factfinder might infer that the victim had been silent and this silence was inconsistent with his testimony. *Cf. State v. Grady*, 183 N.W.2d 707 (Iowa 1971); *People v. Burton*, 55 Cal.2d 328, 11 Cal.Rptr. 65, 359 P. 2d 433, 441 (1961); *People v. Bain*, 5 Ill.App.3d 632, 283 N.E.2d 701 (1972); *United States v. Stell*, 4 C.M.R. 490, 494 (C.G.B.R. 1952); Wigmore, *supra*, § 1135. As stated by the California Supreme Court in *People v. Burton, supra* 11 Cal.Rptr. at 75–76, 359 P.2d at 443–44, the theory of admissibility of a fresh complaint is that "[i]t is natural to expect that the victim of

---

**6.** The Analysis notes that "at least two circuits have read such a requirement into the rule. *United States v. Quinto*, 582 F.2d 224 (2d Cir. 1978); *United States v. Scholle*, 553 F.2d 1109 (8th Cir. 1977)," but adds that "[t]he propriety of this limitation is clearly open to question. *See generally United States v. Rubin*, 609 F.2d 51 (2d Cir. 1979)," *aff'd*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

**64**

such a crime would complain of it, and the prosecution can show the fact of complaint to forestall the assumption that none was made and that therefore the offense did not occur." Since the fact of the complaint is admissible to corroborate the alleged victim, the victim must be a witness. *State v. Grady, supra*; *Wigmore, supra*, § 1136.

The 1969 Manual stated that fresh complaint "is admissible for the purpose of corroborating the testimony of the victim"; but, it omitted the word "solely" and, unlike its 1951 predecessor, did not preclude the use of evidence of fresh complaint "for the purpose of showing directly the truth of the matters stated in the complaint." From this change in language and from the Manual's placement of the discussion of fresh complaint among the hearsay exceptions, it would seem arguable that the fact of fresh complaint could be considered by the factfinder as substantive evidence and that evidence concerning this fact could be received even if the victim did not testify as a witness. However, the Analysis of Contents of the 1969 Manual stated that evidence of fresh complaint "is not an exception to the hearsay rule but is only a rule of corroboration of the testimony of the alleged victim that the act was done without the victim's consent." *See* DA Pamphlet 27–2, Analysis of Contents, Manual for Courts-Martial, United States, 1969, Revised edition, para. 142*c*.

Possible confusion about the admissibility of evidence of fresh complaint may have been compounded by some of our Court's precedents. In *United States v. Thompson*, 3 M.J. 168, 170 (C.M.A. 1977), we stated that "under prior decisions of this Court fresh complaint must consist of the victim of an alleged sex offense having communicated his or her complaint to the witness while in a state of shock, outrage, agony and resentment—the adrenergic circumstances which prompted the report." We explained, quoting 6 Wigmore, *Evidence* § 1749 (Chadbourn rev. 1976), that "the statement must have been made under circumstances calculated to give some special trustworthiness to it ... that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." 3 M.J. at 171. However, in *United States v. Annal*, 13 U.S.C.M.A. 427, 32 C.M.R. 427 (1963), we stated:

Complaint need not be made immediately after commission of the offense and during a time when the complainant is still in a condition of excitement, shock or surprise. It is sufficient if made "within a short time" after the event.

These two statements are difficult to reconcile. Perhaps in *Annal* the Court was attempting to clarify that evidence of fresh complaint did not have to comply with the conditions applicable to the admissibility of spontaneous exclamations under paragraph 142*b* of the 1951 Manual, *see also United States v. Mounts, supra*, and that it is only necessary for the complaint to be made "within a short time"—this being the language of paragraph 142*c* of the Manual at the time that *Annal* was decided.

On the other hand, *Thompson* may best be explained as requiring that—in construing the 1969 Manual's language that a complaint must be made "within a reasonable time" after commission of the sex offense—some attention be paid to the alleged victim's state of mind at the time of the complaint. If the offense had generated strong emotions which were present at the time, the complaint might be considered fresh and received into evidence. On the other hand, if—without some special reason, such as threats, duress, or fear of reprisals—the victim delayed in complaining until his emotions had completely subsided, the complaint would not be fresh and should be excluded. Thus, we held inadmissible as a fresh complaint a report by one sailor to another "that an officer had made a pass at him," because it appeared that the former had been "so unconcerned over the event that he did not bother to identify the officer involved, or even to indicate the nature of the alleged action." *United States v. Pitasi*, 20 U.S.C.M.A. 601, 603, 605, 44 C.M.R. 31, 33, 35 (1971). *See*

also *United States v. Bennington*, 12 U.S. C.M.A. 565, 31 C.M.R. 151 (1961).

### III

■ During the Article 39(a) session before trial commenced, defense counsel moved unsuccessfully to suppress evidence about Specialist Anso's statement to Warrant Officer Ide. In view of the military judge's ruling on the motion, it was unnecessary for defense counsel to repeat his objection when Anso and Ide testified, and the cross-examination of Anso about her delay in reporting the incident with appellant did not open the door for reception of the evidence. *Cf. United States v. Cofield*, 11 M.J. 422 (C.M.A. 1981).

■ In ruling on the defense motion *in limine*, the judge stated that the court members would "be ... instructed that they have to disregard ... [the complaint] if they determine it was not a fresh complaint under the circumstances." In this regard, the judge misperceived the proper allocation of responsibilities between himself and the members. Usually, admissibility of evidence is solely the province of the judge, while the court members are concerned with the weight to be accorded evidence which has been admitted. Apparently, the only express exception to this principle in the 1969 Manual concerned statements by an accused, as to which the judge "should instruct ... that each member ... must disregard the statement entirely as evidence against the accused if he is not convinced beyond a reasonable doubt that it was voluntary." Para. 140a (2). Otherwise, the court members had no occasion to consider admissibility of evidence.

■ In his instructions to the members, the judge did not specifically advise them that they would be required to disregard Anso's report to Warrant Officer Ide if they determined it did not constitute a fresh complaint. However, his instruction that "[i]t is for you as members of the court to determine whether or not under the circumstance of this particular case the report to Mr. Ide did constitute a fresh complaint" may have been intended by him

to convey this erroneous meaning. At best, the instruction was ambiguous.

■ The judge informed the members that the offense with which appellant was charged—conduct unbecoming an officer and gentleman under Article 133 of the Code—was not technically a sexual offense. However, he apparently concluded that the alleged crime was subject to the provisions of paragraphs 142c and 153a of the 1969 Manual. We agree with this interpretation. Sandoval's alleged misconduct constituted one of the "offenses of a sexual nature" for purposes of the "fresh complaint" exception under paragraph 142c. In light of the close relationship of this paragraph to paragraph 153a, concerning corroboration, it also was an offense which required corroboration of the testimony of the victim.

■ Obviously, Specialist Anso's discussion with Warrant Officer Ide did not constitute a "spontaneous exclamation" within the meaning of paragraph 142b, for by that time she certainly was not "in ... a condition of excitement, shock or surprise." Likewise, we are reluctant to sustain the admissibility of her report to Mr. Ide on the theory that it was a prior consistent statement.

■ For one thing, this theory was not mentioned at trial or relied on by the judge. *Cf. United States v. Pastor*, 8 M.J. 280 (C.M.A. 1980); *United States v. Rener*, 17 U.S.C.M.A. 65, 37 C.M.R. 329 (1967). *But see United States v. Burnette*, 698 F.2d 1038, 1048 (9th Cir.) *cert. denied,* — U.S. —, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983); *United States v. Hall*, 565 F.2d 917, 920 (5th Cir. 1978). Secondly, up to the time that the statement was admitted into evidence, Anso's testimony had not "been attacked," as required by paragraph 153a as a predicate for the admission of a prior consistent statement. Even though Anso was subjected to cross-examination, that alone does not constitute an attack for these purposes. *See United States v. Kellum, supra.*

Furthermore, according to the language of paragraph 153a and the examples it provided, a prior consistent statement would be admissible only if it preceded the existence of the influence, motive, or bias that is claimed to have impaired the witness' credibility, in support of which the prior statement was offered. In the present case, nothing in the record suggests that, *after* her discussion with Ide, Specialist Anso was subjected to any sort of influence, or that any event occurred which might have affected the truthfulness of her testimony in some way. Thus, if Anso was testifying falsely at trial, this apparently was because of motives that would equally have induced a false report by her to Warrant Officer Ide two and a half weeks after the incident.

The evidence of Anso's report to Ide meets several of the requirements for admissibility under paragraph 142c of the 1969 Manual. Although lack of consent was not an element of the crime with which appellant was charged, certainly the purport of Anso's testimony is that she gave no consent to his contacts with her body. *Cf. United States v. Huff, supra.* Moreover, the testimony about her report to Ide did not include details of the sexual offense, as would be prohibited by paragraph 142c of the Manual. *Cf. Wigmore, supra,* § 1136; *but see Shoemaker v. State,* 228 Md. 462, 180 A. 2d 682 (1962) (Maryland law does not limit evidence to the fact of a complaint).

On the other hand, Anso's report to Ide seems very close to the general type of discussion which we ruled in *Pitasi* did not qualify as a complaint. Furthermore, while Anso's delay of two and a half weeks might seem reasonable if she were a timid child or had been subjected to threats, *cf. Fitzgerald v. United States, State v. Twyford,* and *People v. Bonneau,* all *supra,* the delay seems much less reasonable for someone who claimed to have been subjected to the indignities about which

Anso testified. Certainly it is hard to say that her complaint was made "as soon after the offense as a reasonable opportunity presented itself." *Lauderdale v. State,* 85 So.2d 822, 823 (Miss. 1956). Indeed, it would seem anomalous for Anso's report to Ide to be admitted as a fresh complaint when her delay in making the report was so great as to induce the judge to instruct the members about the significance of a *lack* of fresh complaint. In any event, the discussion with Ide would seem to fail the test announced in *Thompson* that "fresh complaint must consist of the victim of an alleged sex offense having communicated his or her complaint to the witness while in a state of shock, outrage, agony and resentment." 3 M.J. at 170 (footnote omitted).

■ The Court of Military Review concluded that the judge erred in admitting evidence about Anso's discussion with Ide but went on to hold that the error was not prejudicial. On the latter point, we must part company with the court below. In the first place, if this evidence had not been admitted, the defense, upon its request, would have been entitled to an instruction that if the members considered Anso's testimony to be "self-contradictory, uncertain, or improbable," they must acquit appellant. *See* para. 153a, 1969 Manual, *supra; United States v. Weeks,* 15 U.S.C.M.A. 583, 36 C.M.R. 81 (1966). Without disparaging the alleged victim's testimony in any way, we cannot deny that a reasonable factfinder might have concluded that Anso's testimony fell within one or more of these three categories of weakness.[7] Secondly, when we consider the emphasis given at trial to Specialist Anso's "fresh complaint"—especially in the arguments of counsel and the instructions to the members—we are convinced that this evidence may have affected the outcome of the case.

■ Furthermore, the instructions concerning this lack of evidence increased the likelihood of prejudice from the error. We

---

7. Indeed, the Article 32, UCMJ, 10 U.S.C. § 832, investigator described Anso as "very confused and disoriented during her testimony."

have already noted that the judge apparently misperceived the allocation of responsibilities between him and the members in determining what evidence could be considered by them. Also, in another respect, he misapplied the "fresh complaint" principle. In his instructions to the members, the judge advised them: "For example: a person in a state of shock, surprise, or excitement might not reasonably be expected to complain until after the effects of such state have worn off." This advice turns *Thompson* upside down. There, we concluded that the report of a sex offense was inadmissible as a fresh complaint, unless the witness was "in a state of shock, outrage, agony and resentment." 3 M.J. at 170. However, the language of the judge's instruction seems to say that it is unreasonable to expect someone to complain while in such a state—an affirmation that defies ordinary experience and common sense. More charitably, the instruction might be construed to mean that it would be perfectly reasonable for a victim to delay until the state of shock was over. Of course, such a conclusion is contrary to the rationale of *Thompson*. However, even if that rationale were faulty, the judge should have abstained from expressing his view about the reasonableness of the alleged victim's behavior under such circumstances.

Frequently, we disregard ambiguities or even errors in an instruction when counsel has not specifically objected thereto. However, we do not believe such an approach to be appropriate in the present case. Here, at the very beginning of the trial, defense counsel contested admissibility of the claim to fresh complaint by his motion *in limine*. Thereafter, he maintained his position consistently by cross-examination of Specialist Anso and later by requesting an instruction on lack of fresh complaint. Thus, the military judge was placed on notice of the defense position. Under these circumstances, there was no waiver of appellant's right to complain when, by erroneous instructions, the judge set the scene for the members to misuse the evidence of fresh complaint which had been erroneously admitted.

Our reluctance to disregard instructional error in this case accords fully with our pronouncement two decades ago that

[i]nstructions in a prosecution for sexual crime are to be weighed with the utmost care, since in this class of cases the accused is almost defenseless and ample opportunity is afforded for the free play of malice and private vengeance. He should be given the full measure of every legal right in an endeavor to maintain his innocence.

*United States v. Goodman*, 13 U.S.C.M.A. at 668, 33 C.M.R. at 200.

## IV

The decision of the United States Army Court of Military Review is reversed; the findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge FLETCHER concurs.

COOK, Judge (dissenting):

Paragraph 153*a*, Manual for Courts-Martial, United States, 1969 (Revised edition) (as changed through Change 2, effective November 3, 1977), in effect at the time of appellant's trial, provided that "a conviction cannot be based upon uncorroborated testimony given by an alleged victim in a trial for a sexual offense ... if ... the testimony is self-contradictory, uncertain, or improbable." Accordingly, the military judge instructed the members "that a conviction for the offense alleged, that being indecent acts unbecoming an officer, cannot be based on the uncorroborated testimony of the alleged victim if that testimony is self-contradictory, uncertain, or improbable." Thus far it would have appeared that the military judge was on fairly solid grounds. However, my Brothers apparently conclude that the evidence of corroboration, i.e., Mr. Ide's testimony, was improperly before the court-martial. 18 M.J. 55, 66. Therefore they apparently believe appellant should have received an instruction to the effect "that if the mem-

bers considered ... [the victim's] testimony to be 'self-contradictory, uncertain, or improbable,' they must acquit." *Id.* at 66. The instruction actually given by the military judge, on the other hand, left open the possibility of a conviction, even if the victim's testimony was "self-contradictory, uncertain, or improbable," as long as the members believed her testimony had been corroborated.[1]

Turning to the question of whether there was corroborating evidence which could properly be before the court, I note that "corroborate" is defined as "[t]o strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence." *Black's Law Dictionary* 311 (5th ed. 1979). The Manual for Courts-Martial teaches that:

In a prosecution for a sexual offense in which an alleged victim of either sex has testified that consent was lacking, evidence that the alleged victim made a complaint of the offense within a reasonable time after its commission is admissible *for the purpose of corroborating* the testimony of the victim, and this is so whether or not lack of consent is an element of the offense and even if the credibility of the victim has not been directly attacked.

Para. 142*c* (emphasis added). Thus, it appears the testimony of a victim can be "corroborat[ed]"—or "strengthen[ed]"—by evidence that a complaint was made "within a reasonable time."

Must this "fresh complaint" qualify as an exception to the hearsay rule? Evidently not—for hearsay is "[a] statement which is offered in evidence to prove the truth of the matters stated therein, but which was not made by the author when a witness before the court at the hearing in which it is so offered." Para. 139*a*, Manual, *supra.*

However, evidence of "fresh complaint," as we have just seen, can be offered merely for the purpose of demonstrating that a complaint was made.[2] *See also* DA Pamphlet 27–2, Analysis of Contents, Manual for Courts-Martial, United States, 1969, Revised edition, para. 142*c*. Therefore, *United States v. Thompson*, 3 M.J. 168 (C.M.A. 1977), is wrong to the extent it holds that

fresh complaint must consist of the victim of an alleged sex offense having communicated his or her complaint to the witness while in a state of shock, outrage, agony and resentment-the adrenergic circumstances which prompted the report.

*Id.* at 170 (footnote omitted).[3] There is, it turns out, no requirement that fresh complaint also qualify as a spontaneous exclamation or any other exception to the hearsay rule. *Cf.* para. 142*b*, Manual, *supra.*

Just how "fresh" must such a complaint be? Professor Wigmore explains:

Under the early rule of hue-and-cry, it was necessary that there should have been fresh complaint; and this notion has been perpetuated in the statement, usual in enunciating the modern rule, that *the complaint must have been recent*, in order that the fact of it may be admitted.

A few courts have applied this notion practically in their rulings, by excluding complaints made after a certain length of time. But, if it be considered that the purpose of the evidence is merely to negative the supposed silence of the woman, it is perceived that the fact of complaint *at any time* should be received. After a long delay, to be sure, the fact is of trifling weight, but it negatives silence, nevertheless, and the accompanying cir-

---

1. Of course it is entirely possible that the court members thought that the victim's testimony was not "self-contradictory, uncertain, or improbable" and, thus, not in need of corroboration. Unfortunately, we have no way of knowing whether they did or not.

2. Note that the military judge instructed the members, "Now, on the question of corrobora-

tion, evidence of fresh complaint or lack thereof is admitted solely for its bearing, if any, on the credibility of the complaining witness, that being Specialist Anso."

3. For this reason I am undisturbed that the military judge "turn[ed] *Thompson* · upside down," 18 M.J. at 67—it needed it.

cumstances must determine how far the delay has been successfully explained away.

4 Wigmore, *Evidence* § 1135(A)(1)(d) (Chadbourn rev. 1972) (footnotes omitted).

In addition, a succinct recitation of the various theories for admitting evidence of complaint of crime appears in Annot., 19 A.L.R.2d 579 (1951):

> To avoid any confusion, it should be noted at this time that there are three distinct theories upon which evidence of complaints by a victim of rape may be received in evidence: (1) to show that a complaint was made, for the purpose of negativing the supposed inconsistency of silence; (2) to corroborate the victim's testimony if she was impeached as a witness; (3) as spontaneous or res gestae declarations. The distinction is important, for under the first two theories the victim must have been a witness and the details of the complaint may not be admissible, whereas under the third theory the victim need not be a witness and the details are admissible.
>
> [W]ith regard to the admissibility of a complaint under the corroboration theory, it should be noted that some courts have excluded evidence of complaints made any considerable length of time after the commission of the offense, in the absence of such excuse for the delay as the law recognizes. Other authorities hold that mere lapse of time will not exclude evidence of the complaint, but is a circumstance for the consideration of the jury. Still others take the view that the question of time rests in the discretion of the trial court. 44 Am Jur, Rape § 86.

*Id.* at 581–82 (footnote omitted). *See also* Wigmore, *supra*, § 1134.

Obviously the President, in paragraph 153a, Manual, *supra*, has, at a minimum, accepted the corroboration theory for admitting evidence of complaint of a sex crime, and he has established that only complaints made "within a reasonable time" after commission of the offense will be admitted. Para. 142c, Manual, *supra*.

Exactly what constitutes "a reasonable time" is unspecified. Presumably some measure of discretion is involved.

Several questions are then presented. The first is, did the victim here actually lodge a complaint? To answer that, let us consider her responses to trial counsel on direct examination:

Q: Did you report this immediately?

A: No.

Q: Why not?

A: I was scared, confused. I was hoping that if I tried to pass it off and forget about it and he would too.

Q: Did you ever report it?

A: Yes.

Q: Why?

A: I reported it the day he called me up for a luncheon date and I just knew that he did this, I had to do something to stop the situation.

According to Chief Ide, the recipient of the report:

A: [S]he came to my office during my lunch hour and asked to just talk.

Q: What was the subject of the conversation?

DC: Objection, Your Honor, hearsay.

MJ: Objection is overruled.

A: The conversation—the first conversation started that she had problems, emotional problems, she'd just like to talk with me about it, if I didn't mind interrupting my lunch hour, and I said if you don't mind my eating my sandwich, go ahead. So, she started talking about, in general, that she had been having problems in this section. And I said, well I didn't understand all that. Then, that lead into—she said, well, really what it comes down to is I don't know how to discuss a problem with my husband. And I said, well, go ahead, if you feel that I can help you. She says, well, a man has made a pass at me. Well, that's not a bit unusual, I said, I'm sure you

had several. She said, well, I don't mean passes like the GIs here in the office do, or just a verbal pass. She said, one of the men had put their hands on me.

In short, the victim sought out a superior warrant officer and reported the incident to him in order to forestall further uninvited advances on the part of appellant. If this was not a complaint, I do not know what is.

The second question is, was the complaint made "within a reasonable time"? Here the military judge and the court members, in their discretion, could have considered: that the victim was a relatively low-ranking enlisted woman, living in a male-officer-dominated society; that any complaint she might have had against appellant would have involved an allegation against a male officer of considerably superior rank to her, without benefit of a witness; that she expressed concern about what her husband might do to appellant if he learned of the incident; that she expressed apprehension that a report of the incident might affect her own marital relations; that she was a friend of appellant's wife and felt sorry for her; and that it was the threat of further advances by appellant that finally induced her to report the incident. In my opinion, these factors are sufficient to explain her initial hesitation and the ensuing complaint. Under the circumstances, I cannot conclude, as a matter of law, as my Brothers apparently have, that the complaint was not made "within a reasonable time." Accordingly, in my opinion, Mr. Ide's testimony properly could have been placed before the court-martial. The next question is, was it properly so placed?

My Brothers evidently conclude that the military judge abdicated his responsibility to determine the admissibility of the complaint evidence. This is what the military judge told counsel:

MJ: As to the motion concerning suppression of the statements that are made by Specialist Anso as to complaints, I'm not going to suppress those, I'm not going to grant that motion, however; the court will be instructed on the question, they determine whether or not a fresh complaint was made.

DC: But Your Honor, it would clearly be hearsay.

MJ: Well, it would be hearsay—they'll be so instructed that they have to disregard it if they determine it was not a fresh complaint under the circumstances. I'm not going to allow things that come in—ah—statements made by her to other females in the barracks, I don't know what you intend to introduce on this. It appears from reading the pretrial advice that you might be intending to introduce a statement made to Mr. Ide?

TC: Ide. Yes, sir.

MJ: Is that the only thing you have in mind?

TC: Yes, sir.

MJ: Well, I'm not going to suppress that statement even though it was made two weeks after—I'm not going—I wouldn't suppress it.

DC: If Mr. Ide testified, what he would testify would be hearsay.

MJ: Well, it's hearsay and a fresh complaint is, of course, and the court members are instructed that it's not a matter that they may use to determine facts in the case, it's merely corroboration, you read that instruction on fresh complaint?

\* \* \* \* \* \*

MJ: My ruling is that I will allow evidence of complaints of the alleged incident to other people under the theory it constitutes, or might constitute fresh complaint.

I construe the foregoing to indicate nothing more than that the military judge determined that the evidence of fresh complaint met the threshold requirements for admissibility and warranted him in sending it to the court members with appropriate instructions. In this, I see no indication that

the military judge abdicated his responsibility, nor do I believe he abused his discretion. *See United States v. Duff,* 707 F.2d 1315, 1318–19 (11th Cir. 1983); *United States v. Kearney,* 560 F.2d 1358, 1369 (9th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977).

The instructions to the court members were:

> Now, you are advised that *a fresh complaint is one that is made within a reasonably short time after the event occurs considering all of the circumstances.* For example: a person in a state of shock, surprise, or excitement might not reasonably be expected to complain until after the effects of such state have worn off.
>
> Now, there is evidence, of course, of a delay of the alleged victim to make known the alleged offense against her, after her first reasonable opportunity under the circumstances. This delay is a proper factor for your consideration and it may seriously affect the credit to be given to Specialist Anso's testimony. Indeed, the failure to complain promptly may under the circumstances justify an inference against the sincerity of the complaint and against the reliability and the trustworthiness of the alleged victim's testimony. *It is for you as members of the court to determine whether or not under the circumstances of this particular case the report to Mr. Ide did constitute a fresh complaint.*

(Emphasis added.)

In other words, it was for the court members to decide whether the report to Mr. Ide was "made within a reasonably short time after the event ... considering all of the circumstances." If the report was not made "within a reasonable time," the members could consider that fact as reflecting adversely on the victim's credibility. Again, I perceive no error. Who but the court members are better suited to make such determinations?

For the foregoing reasons, I would affirm the decision of the United States Army Court of Military Review.