UNITED STATES, Appellee,

v.

Andrew S. GORDON, Private First
Class, U.S. Army, Appellant.

No. 44493.

CM 441410.

U.S. Court of Military Appeals.

Oct. 1, 1984.

For Appellant: *Colonel William G. Eck-
hardt, Colonel R. Rex Brookshire, II, Cap-
tain David M. England, Captain Richard
W. Vitaris* (on brief); *Captain L. Sue
Hayn, Captain Frank J. DiGiammarino.*

For Appellee: *Lieutenant Colonel John
T. Edwards, Captain Patrick M. Flachs,
Captain Michael E. Pfau* (on brief); *Colo-
nel R. R. Boller.*

---

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial composed of offi-
cer and enlisted members in Mannheim,
Germany, on July 7 and 8, 1981, convicted
appellant, contrary to his pleas, of house-
breaking and rape, in violation of Articles
130 and 120, Uniform Code of Military Jus-
tice, 10 U.S.C. §§ 930 and 920, respectively.
He was sentenced to a dishonorable dis-
charge, confinement at hard labor for 3
years, and reduction to E-1. After all in-
termediate reviewing authorities approved
appellant's conviction, we granted review
of this issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY ADMITTING INTO EVIDENCE THE PHOTOGRAPHS OF THE LINEUP OVER DEFENSE OBJECTION.

We now affirm.

I

Sylvia Crusius, the alleged rape victim, was an unmarried twenty-nine year old German national who lived in an apartment near appellant's duty station at Coleman Barracks. She testified that she had first seen Gordon on November 29 or 30, 1980, when he had alighted from a taxi at her apartment house and had come to her door to ask where Monika Tirado-Lopez lived. After Crusius attempted to explain to appellant, who did not fully understand German, that Monika lived across the street and down the block a short distance, she went outside and gave directions to the taxi driver. During this first encounter with appellant, Mrs.[1] Crusius testified that she had the opportunity to observe appellant "closely" for about five or six minutes.

On December 3, sometime between 6:00 and 7:30 p.m., she saw Gordon again; and she had a second opportunity for a "good look" at his face. On this occasion, someone had rung Mrs. Crusius' doorbell, and when she opened the door, appellant was there. He asked her whether she had a telephone; but when she responded in the negative, he placed his foot between the door and the door frame. However, appellant abruptly left when the light in the hallway was turned on and footsteps were heard on the stairs. Mrs. Crusius then closed her door; dressed her little son and put him to bed; and began watching television.

Approximately ten to thirty minutes later, someone rang the doorbell to her apartment from outside the front door of the building. She pressed the buzzer and opened the front door to her apartment because she thought it was her sister, who usually visited her every night. When Crusius recognized that, instead, Gordon was the visitor, she began to scream angrily and attempted unsuccessfully to close her door. He forced his way into her apartment, hit her in the temple, grabbed her around the throat, and pushed her into the bedroom, where her son was sleeping. At that point, Mrs. Crusius lost consciousness. When she came to, she found herself lying on the bed with her lower garments off, and appellant was taking off her "pullover." Appellant "stroked" her breasts, kissed her, and then had intercourse with her. She did not scream or struggle because she feared for the safety of her son—who was sitting at the end of the bed, watching and crying.

According to Mrs. Crusius, after intercourse Gordon picked up her son and walked through the kitchen. She testified that light in the kitchen enabled her to determine that her assailant was wearing a military uniform and to see the name "Gordon" on his field jacket. She then led him to the living room, where she turned on the lights. However, Gordon turned them right off, sat down in an armchair, and held her child on his lap. He asked her to be his girlfriend; but she told him to leave and come back tomorrow because her husband was coming home soon. Appellant then left. Mrs. Crusius estimated at trial that appellant remained in her apartment for ten minutes, at most, after raping her.

Upon Gordon's departure, Mrs. Crusius went across the hall to a neighbor's apartment. She told him that she had just been assaulted and asked to use his telephone to call the police. Responding, the German police arrived at her apartment about 8:25 p.m. After giving them details of the rape, Mrs. Crusius was taken to the hospital and examined by the chief gynecologist, who testified at trial that he had found enough mobile spermatozoa to indicate that intercourse had occurred within the preceding five hours.

1. Although Sylvia Crusius was not married at the time of these events, she testified that in Germany, if a woman has a child, she is referred to as "Mrs."

Special Agent Martin Nowicki, an investigator with the Mannheim Criminal Investigation Division (CID) office, learned that Mrs. Crusius had been raped and that she had stated that the assailant was a black man named either "Gordon or Gorgon." Through the 187th Personnel Service Center at Funari Barracks, he was able to ascertain the names of everyone stationed in the Mannheim area whose name was Gordon or Gorgon. While there were no "Gorgons," he learned that there were eleven "Gordons," six of whom were black. Of these six blacks, only two were stationed at Coleman Barracks; and only one of them—appellant—fitted the description of the rapist given by Mrs. Crusius.

On December 5, Nowicki conducted a lineup, for which the unit had furnished "five individuals ... similar in physical appearance to" appellant. There were four showings, during which everyone in the lineup was similarly dressed. Appellant was in the first, third, and fourth showings. Another black soldier named Gordon who was stationed at Coleman Barracks also was in the fourth showing. According to Nowicki, Mrs. Crusius correctly identified appellant each time that he was in the lineup; and she did not identify anybody as the assailant in the second array. Furthermore, he testified that when Mrs. Crusius identified appellant, she did it within seconds and indicated that she was "100%" sure.

All four showings had been photographed by a German police photographer, and trial counsel offered the photographs in evidence. Defense counsel objected that he had received insufficient notice of the Government's intent to introduce the photographs in evidence. Moreover, he contended that two of the photographs were "prejudicial to the accused," because Gordon had been "looking in a different direction"; and he objected to a third photograph which showed another person in the lineup looking at appellant. Finally, defense counsel argued:

> [W]e believe that Rule 321 [of the Military Rules of Evidence] contemplates that only evidence showing [the] fact of prior identification is contemplated under Rule 321, and not the conditions of identification. In other words, what I'm trying to say, sir, is that it's really not relevant in the sense that it's—in the sense that Rule 321 contemplates that he can come in and say, "Yes, I previously identified him." I think that to allow the photos to come in allows it to become the one sole issue, you know, was this a good photograph of the line up. I think that it adds confusion that isn't highly relevant evidence. Now I also believe that it's hearsay, Your Honor, and that it's offered to show a prior identification out of court, the statement of the victim. All right. *And it goes to the propriety of suggestability of the line up, which is not an issue, and we have never raised [that] as an issue.* In our opening argument we said that there was no issue that she had picked him out.

In response to the defense objections, the military judge refused to admit the photograph in which another lineup participant had been looking at Gordon; but he admitted the remaining photographs. Later, trial counsel used the photographs in examining Agent Nowicki about the lineups he had conducted, at which Mrs. Crusius identified Gordon as the rapist. According to Nowicki, "[T]hese pictures [are] fair representations of how the line up was immediately before ... the victim was allowed to enter the room and identify the line up."

Later in the trial, Special Agent Charles King testified by stipulation that on December 19, he interviewed appellant about the incident while Agent Nowicki monitored the interview through a microphone and a two-way mirror. During the first part of the interview, appellant denied having raped Mrs. Crusius. However, when King stopped to handle some administrative matters, Gordon began mumbling. Initially, King could not make out what he was saying. However, appellant raised his voice, and King stated that he "heard him say that he did not understand all the things that were happening to him" or why

they "were happening." Then, appellant exclaimed, "She wanted to be screwed. The bitch asked to be screwed."

During the trial, Miss Monika Tirado-Lopez also testified that she knew appellant, who had been at her house once in November. Toward the end of that month or possibly early in December, Mrs. Crusius told her that a couple of days earlier, a black male with a very courteous manner and wearing a brown jacket and a pair of dark trousers came in a taxi cab looking for Monika. Thereupon, she told Mrs. Crusius that Gordon was the only person she knew who fit that description.

However, when he took the stand in his own defense, Gordon claimed that he did not know Mrs. Crusius and had never been to her apartment. He relied on several alibi witnesses—although none of them could testify that he had been in their presence precisely at the time of the alleged rape. Gordon testified that he told Agent Nowicki that he was wearing fatigues on the evening of the alleged rape and that his field jacket had been misplaced or stolen.

## II

In the cross-examination of Mrs. Crusius, some reference was made to the lineup and also to whether the persons in the lineup had mustaches; but Mrs. Crusius never testified that she had identified Gordon at the lineup. Instead, the prior identification was established by Special Agent Nowicki. Mil.R.Evid. 321(a)(1) specifically authorizes reception of testimony about a lineup in this manner:

> Testimony concerning a relevant out of court identification by any person is admissible, subject to an appropriate objection under this rule, if such testimony is otherwise admissible under these rules. *The witness making the identification*

*and any person who has observed the previous identification may testify concerning it.* When in testimony a witness identifies the accused as being, or not being, a participant in an offense or makes any other relevant identification concerning a person in the courtroom, evidence that on a previous occasion the witness made a similar identification is admissible to corroborate the witness' testimony as to identity even if the credibility of the witness has not been attacked directly, subject to appropriate objection under this rule.

(Emphasis added.) Since defense counsel offered no objection to Nowicki's testimony, we need not decide whether—in light of Mil.R.Evid. 801(d)(1) [2]—it would have been subject to a hearsay objection. *See* Mil.R. Evid. 103(a)(1).

Accordingly, the only question now before us is whether the photographs of the lineup were properly admitted to bolster Mrs. Crusius' prior identification. For an answer, we turn first to Mil.R.Evid. 401 which defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Whether Mrs. Crusius accurately identified Gordon in the lineup is of consequence to the determination of his guilt or innocence, for, otherwise, there would be no basis for admitting Nowicki's testimony about the prior identification. The conditions under which the prior identification was made are relevant to this question of its accuracy. For example, if the participants were arranged in a way that tended to direct Mrs. Crusius' attention to appellant, the weight of her testimony would be diminished.

In many kinds of trials, photographs [3] are admitted in evidence because they aid

---

**2.** A prior identification is one of three types of prior statements by a witness which, under Mil. R.Evid. 801(d)(1), is not hearsay. *United States v. Sandoval,* 18 M.J. 55, 62 (C.M.A. 1984). However, Mil.R.Evid. 801(d)(1) applies only when the person who made the prior identification

"testifies at the trial or hearing and is subject to cross-examination concerning the statement" of identification.

**3.** "Photograph" is defined in Mil.R.Evid. 1001(2).

the factfinder in understanding and applying other evidence. Indeed, there is considerable truth in the old axiom that "a picture is worth a thousand words." This being so, we conclude that the photographs were relevant evidence here.

Mil.R.Evid. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States as applied to members of the armed forces, the Uniform Code of Military Justice, these rules, this Manual, or any Act of Congress applicable to members of the armed forces." We perceive no basis in the Constitution, statutes, or the Manual for excluding these photographs. Moreover, while in some cases Mil.R.Evid. 403 might justify excluding photographs of a scene or event, there is no reason to invoke that Rule in this case.

■ Often in some cases the reception of such photographs in evidence will help effectuate the objectives of Mil.R.Evid. 321, which concerns "eyewitness identification." Mil.R.Evid. 321(b)(1)(A) declares that "[a] lineup ... is 'unlawful' if it is ... conducted by persons subject to the Uniform Code ... or their agents and is unnecessarily suggestive or otherwise in violation of the due process clause of the Fifth Amendment to the Constitution." The Rule's concern with suggestiveness of a lineup reflects the fear expressed by the Supreme Court that, unless properly monitored, a lineup will be suggestive and so will be an instrument of falsehood rather than of truth. *See, e.g., United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *cf.* E. Loftus, *Eyewitness Testimony* (Harv. U. Press 1979). If the judge has before him photographs representing the position and the appearance of the lineup participants, he is far better prepared to determine whether the lineup was suggestive.[4]

■ Although photographs of a lineup can assist the factfinder in determining whether the lineup is suggestive, their admissibility does not depend on a defense claim of suggestiveness. In this regard, our view can be summarized in this passage from the government brief:

When an accused defends against criminal charges by contending that he has been improperly identified as the perpetrator, "[a]ll facts affording any reasonable inference as to the identity of [the] person charged with having committed [the] crime are properly admitted where [they] tend[ ] to establish guilt." *Abernathy v. United States*, 402 F.2d 582, 584 (8th Cir. 1968), *quoting Cochran v. United States*, 310 F.2d 585, 589 (8th Cir. 1962). Since identification is a factual issue to be resolved by the members and alleged uncertainties in identification affect the weight rather than the admissibility of identification evidence, any fact which is relevant to identification is admissible if it would tend to persuade a person of ordinary judgment on the identification issue. *State v. Hill* [83 Wash.2d 558], 520 P.2d 618 (Wash. 1974); *Commonwealth v. Harrison* [290 Pa.Super. 389], 434 A.2d 808 (Pa. Super. 1981); *State v. Fischer*, 387 So.2d 473 (Fla. App. 1980); *Rhodes v. State* [154 Ind.App. 594], 290 N.E.2d 504 (Ind. App. 1972).

A photograph of the pretrial line-up at which the victim identified the accused is relevant and therefore admissible because it tends to establish the fairness of the line-up and thereby strengthen the Government's identification evidence. *United States v. Eustace*, 423 F.2d 569 (2d Cir. 1970); *French v. State* [95 Nev. 586], 600 P.2d 218 (Nev. 1979); *State v. Perales* [220 Kan. 777], 556 P.2d 172 (Kan. 1976); *State v. Mitchell*, 356 So.2d 974 (La.), *cert. denied*, 439 U.S. 926 [99 S.Ct. 310, 58 L.Ed.2d 319] (1978); *State v. Jefferson*, 284 So.2d 577 (La. 1973); *State v. Valentine* [262 La. 571], 263 So.2d 893 (La. 1972); *State v. Hall* [261 La. 777], 260 So.2d 913 (La. 1973); *Unit-*

---

4. Dean Wigmore suggested at one time that interrogation of a suspect be filmed and evidence of a confession not be admitted unless voluntariness was supported by the film. 3 Wigmore, *Evidence* § 833, p. 461 (Chadbourn rev. 1970).

*ed States v. Gordon, supra ...; see United States v. Baker,* 419 F.2d 83 (2d Cir. 1969), *cert. denied,* 397 U.S. 976 [90 S.Ct. 1096, 25 L.Ed.2d 271] (1970).

The use of photographs of a lineup is not unique to this case, and the adoption of this practice by investigators is commendable. Therefore, we hold that the photographs were properly admitted into evidence by the military judge.[5]

### III

The decision of the United States Army Court of Military Review is affirmed.

Judge FLETCHER concurs.

---

5. Even if the judge erred in this ruling, the other evidence of Gordon's guilt is so overwhelming that such an error could only have been harmless.